Hans RECHSTEINER, Plaintiff-Appellant-Petitioner,

v.

HAZELDEN, Spooner Health System, Board of Directors of Spooner Health System, William Stewart, III, Judy Cuskey, Maxine Long and Mike Schafer, Defendants-Respondents,

ABC INSURANCE COMPANY, DEF Insurance Company and GHI Insurance Company, Defendants.

Supreme Court

*No. 2006AP1521. Oral argument February 20, 2008. —Decided July 16, 2008.*

2008 WI 97

(Also reported in 753 N.W.2d 496.)

For the plaintiff-appellant-petitioner there were briefs by *James A. Drill, Anne E. Schmiege,* and *Doar Drill, S.C.,* New Richmond, and oral argument was by *James A. Drill.*

For the defendants-respondents Spooner Health System, Board of Directors of Spooner Health System, William Stewart, III, Judy Cuskey, Maxine Long and Mike Shafer, there was a brief by *Lindsay G. Arthur, Jr., Sally Ferguson,* and *Arthur, Chapman, Kettering, Smetak & Pikala, P.A.,* Minneapolis, Minn., and oral argument by *Sally Ferguson.*

For the defendant-respondent Hazelden, there was a brief by *Louise Dovre Bjorkman, Stephen P. Laitinen, Mark A. Solheim,* and *Larson King, LLP,* St. Paul, Minn., and oral argument by *Louise Dovre Bjorkman.*

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals,[1] which affirmed a judgment and order of the Washburn County

---

[1] *Rechsteiner v. Hazelden,* 2007 WI App 148, 303 Wis. 2d 656, 736 N.W.2d 219.

Circuit Court, Michael J. Gableman, Judge.[2] The circuit court dismissed Dr. Hans Rechsteiner's (Dr. Rechsteiner) suit and granted summary judgment to defendants Spooner Health System (Spooner); the Board of Directors of Spooner Health System (Board); directors Judy Cuskey, Maxine Long, and William Stewart, III; Spooner administrator Mike Schafer;[3] and Hazelden, an addictionology clinic.

¶ 2. Dr. Rechsteiner has been a general surgeon employed by Spooner on a contract basis. After undergoing diagnosis and treatment for alcohol dependence at Hazelden at the behest of Spooner, Dr. Rechsteiner brought an action alleging medical negligence against Hazelden. He also filed claims of defamation and negligent communication of false information against the Spooner defendants for statements made to Hazelden staff about Dr. Rechsteiner. The defendants moved for summary judgment and asserted statutory immunity

[2] This case was filed in St. Croix County and transferred to Washburn County on September 27, 2005. Washburn County Circuit Judge Eugene D. Harrington was originally assigned to the case, but it was reassigned to Burnett County Circuit Judge Michael J. Gableman on October 31, 2005.

[3] Defendant Spooner Health System will be referred to individually as "Spooner." Spooner Health System, the Board of Directors of Spooner Health System (consisting of Judy Cuskey, Maxine Long, and William Stewart, III), and Spooner administrator Mike Schafer will be referred to collectively as "the Spooner defendants." All individuals will be referred to by last name.

We note the misspelling of Schafer's name in the caption of this case in the circuit court and the court of appeals. This court ordered the caption changed to reflect the correct spelling. The record includes a sworn affidavit by Schafer; his last name is spelled "Schafer" in the body of the affidavit and in the signature block.

under Wis. Stat. § 146.37,[4] Wisconsin's "peer review statute." Before the hearing on summary judgment, Dr. Rechsteiner moved for a continuance to allow additional time for discovery.

¶ 3. The circuit court denied Dr. Rechsteiner's motion for a continuance, granted the defendants' motions for summary judgment, and dismissed Dr. Rechsteiner's complaint on the basis that all defendants enjoyed immunity from civil liability under Wis. Stat. § 146.37. Dr. Rechsteiner appealed, and the court of appeals affirmed, partly on different grounds. *Rechsteiner v. Hazelden*, 2007 WI App 148, ¶ 33, 303 Wis. 2d 656, 736 N.W.2d 219. We granted Dr. Rechsteiner's petition for review.

¶ 4. This case presents multiple questions. Analysis of Questions (1), (2), and (3) regarding Hazelden appears in section II. C., below. Analysis of Questions (4) and (5) regarding the Spooner defendants appears in section II. D. Analysis of Question (6) appears in section II. E. The questions presented, as we see them, together with the answers provided, are stated as follows:

Question (1): Is Hazelden, a third-party addictionology center, too removed from the peer review process initiated by Spooner to be eligible for immunity under Wis. Stat. § 146.37?

Answer (1): No. Hazelden is *eligible* for immunity under Wis. Stat. § 146.37 because it played an integral role in Spooner's medical peer review of Dr. Rechsteiner.

Question (2): Does Hazelden's diagnosis of Dr. Rechsteiner during the medical peer review process qualify for immunity, under Wis. Stat. § 146.37, even if its diagnosis is deemed negligent?

---

[4] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

Answer (2): Yes. Hazelden's medical diagnosis of Dr. Rechsteiner is immune under Wis. Stat. § 146.37, even if the diagnosis is deemed negligent, because Hazelden's diagnosis was made in good faith and was central to a requested evaluation of Dr. Rechsteiner in peer review.

Question (3): Does Hazelden's treatment of Dr. Rechsteiner, following its diagnosis of his medical condition, qualify for immunity under Wis. Stat. § 146.37?

Answer (3): The court is not required to decide whether treatment related to the peer review process qualifies for immunity. If Dr. Rechsteiner's complaint is viewed as focusing on Hazelden's treatment of Dr. Rechsteiner, as opposed to its diagnosis of Dr. Rechsteiner, his complaint cannot survive a motion for summary judgment on the facts of this case.

Question (4): Do the actions and statements of the Spooner defendants qualify for immunity under Wis. Stat. § 146.37?

Answer (4): Yes. The actions and words of the Spooner defendants are immune under Wis. Stat. § 146.37 because they were part of Dr. Rechsteiner's peer review and because the Spooner defendants were presumed to be acting in good faith.

Question (5): Did Dr. Rechsteiner provide evidence to the court that raised a genuine issue of material fact about the good faith of the Spooner defendants?

Answer (5): No.

Question (6): Did the circuit court erroneously exercise its discretion in denying Dr. Rechsteiner's motion for a continuance?

Answer (6): No.

¶ 5. Accordingly, we affirm the decision of the court of appeals.

## I. BACKGROUND

¶ 6. Since 1982 Dr. Rechsteiner has been employed as a general surgeon by Spooner on a contract basis. From 1982 until July 2003, Dr. Rechsteiner was the only full-time surgeon at Spooner and was "on call" 24 hours per day, seven days per week, unless he made prior arrangements with other surgeons in the region. An additional surgeon began working at Spooner in July 2003. Since then, Dr. Rechsteiner has alternated with the new surgeon so that he has been on call every other night.

¶ 7. Dr. Rechsteiner alleges that from the time he was hired by Spooner in 1982 until the present, "Spooner Health System has had no written or oral policy pertaining to drinking alcoholic beverages while on call." During his tenure with Spooner, Dr. Rechsteiner admittedly consumed alcoholic beverages while on call; however, he claims he "never drank to the point of intoxication." The defendants assert that a hospital administrator complained to Dr. Rechsteiner about his drinking in public while on call in 1999.

¶ 8. On March 8, 2003, Dr. Rechsteiner and a family friend, Nathan Christner (Christner), were riding snowmobiles on Dr. Rechsteiner's property. Christner was seriously injured in an accident, and rescue workers were called to the scene. After Dr. Rechsteiner admitted that he had been drinking while snowmobiling, a sheriff's deputy asked Dr. Rechsteiner to submit to a breathalyzer test. Dr. Rechsteiner's blood alcohol content registered .06 percent. Dr. Rechsteiner was the only on-call surgeon for Spooner on March 8. Following the incident, the Board received a sheriff's department incident report of the snowmobile accident, and the Board

met to consider whether an evaluation of Dr. Rechsteiner's conduct was necessary.

¶ 9. On March 14, 2003, Spooner advised Dr. Rechsteiner that under Spooner's bylaws he either had to go on immediate leave or submit to an alcohol assessment and, if necessary, treatment. Spooner further informed Dr. Rechsteiner that his "privileges at the hospital would be suspended until [he] successfully underwent the assessment and any treatment recommended following such assessment."

¶ 10. From March 16 to March 21, 2003, Dr. Rechsteiner underwent an alcohol assessment at the Hazelden treatment center in Center City, Minnesota, which was arranged and paid for by Spooner. As part of the assessment, Hazelden agents and employees contacted Mike Schafer, hospital administrator and CEO of Spooner Health System, Inc., and members of the Board "to request information pertaining to [Dr. Rechsteiner's] career and his alcohol use." Dr. Rechsteiner contends that Schafer and Board members Cuskey, Long, and Stewart communicated false information to Hazelden, which forms the basis for his claims of defamation and negligent communication of false information against the Spooner defendants.

¶ 11. After an assessment, Hazelden diagnosed Dr. Rechsteiner with "alcohol dependence." Hazelden recommended that Dr. Rechsteiner undergo 28 days of inpatient treatment, which Dr. Rechsteiner completed shortly after the assessment. After completing this treatment at Hazelden, Dr. Rechsteiner returned to work at Spooner. Thereafter, Dr. Rechsteiner participated in multiple aftercare programs, including a 12–week course at Luther Midelfort, biweekly Alcoholics Anonymous meetings, and a two-year aftercare program monitored by the Wisconsin Medical Society.

¶ 12. While Dr. Rechsteiner was participating in outpatient aftercare services at Luther Midelfort, he was told by Scott Hansen (Hansen), an Alcohol and Other Drug Abuse (AODA) Supervisor, that Hansen believed Dr. Rechsteiner had been misdiagnosed with "alcohol dependence." Hansen performed his own assessment and made a diagnosis of "alcohol abuse." After speaking with Hansen regarding this diagnosis, Dr. Rechsteiner was evaluated by Paul Sneen (Sneen) of Community Counseling Services. Sneen agreed with Hansen that Dr. Rechsteiner was not correctly diagnosed with alcohol dependence. Afterward, Dr. Rechsteiner wrote Hazelden a letter "requesting that they reconsider their diagnosis."

¶ 13. On August 1, 2003, Jim Atkins (Atkins), Manager of Admissions and Case Management at Hazelden, responded to Dr. Rechsteiner's letter. Atkins advised Dr. Rechsteiner that Hazelden was amending its diagnosis from that of "alcohol dependence" to "alcohol abuse." However, in his letter Atkins informed Dr. Rechsteiner:

> It is important for you to understand that we routinely recommend 28 days of inpatient treatment for participants in the Residential Evaluation Program who meet the criteria for Alcohol Abuse, but not Dependence, and that we would have done so had your original assessment resulted only in a diagnosis of Alcohol Abuse without the diagnosis of Dependence.

¶ 14. On March 29, 2005, Dr. Rechsteiner filed a complaint alleging that Hazelden committed negligence when its agents and employees failed to exercise ordinary care in assessing and diagnosing him. Dr. Rechsteiner's complaint also alleged that the Spooner defendants defamed him by communicating false information to Hazelden. Dr. Rechsteiner further alleged

that the Spooner defendants were negligent in their communication of false information to Hazelden.

¶ 15. For damages, Dr. Rechsteiner contended that he lost approximately $125,000 in income as a result of the work he missed during his treatment at Hazelden and during his participation in the aftercare programs. Dr. Rechsteiner further alleged that as a result of widespread knowledge of his alcohol treatment in the Spooner community, his business decreased, leading to a further loss of income. In his complaint, Dr. Rechsteiner claimed that he "suffered damages," but he did not claim that he suffered any non-economic injury.

¶ 16. On January 6, 2006, the Spooner defendants filed a motion for summary judgment. The Spooner defendants argued that the statements made by Spooner representatives to Hazelden staff were privileged because they qualified as part of a peer review of medical services. The Spooner defendants asserted that the Spooner representatives who made the statements were also entitled to conditional immunity. The Spooner defendants contended that the statements were not defamatory "because they were not published and they did not lower Dr. Rechsteiner's reputation in the community." Finally, the Spooner defendants argued that the Board and individual Spooner representatives were shielded from liability through the corporate structure.

¶ 17. On March 3, 2006, Hazelden also moved for summary judgment. Hazelden argued that it was immune from civil liability under Wis. Stat. § 146.37. Hazelden asserted that even if Dr. Rechsteiner were misdiagnosed with "alcohol dependence," the treatment provided was proper. Finally, Hazelden contended that Dr. Rechsteiner's consent to assessment and treatment and breach of his aftercare contract with the Wisconsin

Medical Society precluded recovery. Hazelden also contended that public policy concerns should preclude Dr. Rechsteiner's recovery of damages.

¶ 18. On March 27, 2006, Dr. Rechsteiner moved for a continuance of the summary judgment hearing date. Dr. Rechsteiner claimed that the motion for a continuance should be granted because the depositions of the Hazelden representatives were scheduled to take place in April 2006, as that was the earliest date that would accommodate all parties involved. Thus, additional time was required for Dr. Rechsteiner to complete the scheduled depositions and additional written discovery. Dr. Rechsteiner also argued that genuine issues of material fact existed and should preclude summary judgment for the defendants.

¶ 19. On April 5, 2006, Dr. Rechsteiner filed a motion to compel the Spooner defendants to respond to questions asked during discovery and depositions. His motion to compel addressed the fact that counsel for the Spooner defendants instructed his clients not to answer certain questions under a claim of Wis. Stat. § 146.38 privilege.

¶ 20. On April 7, 2006, Judge Gableman held a hearing regarding Dr. Rechsteiner's motion for a continuance and the defendants' motions for summary judgment. At the hearing Judge Gableman orally denied Dr. Rechsteiner's motion for a continuance.

¶ 21. On May 4 Judge Gableman issued an order addressing "[w]hether § 146.37, Wis. Stats., which provides immunity from civil liability for those who participate in good faith in a health care services review, provides immunity to Defendants?" Judge Gableman held that Dr. Rechsteiner offered nothing but "conclusory and speculative statements as to the improper motives of at least one participant." The court also

found that Dr. Rechsteiner failed to support his assumption that the review conducted by the defendants must be of the technical aspects of medical services to warrant Wis. Stat. § 146.37 immunity. The circuit court considered all facts and found that each defendant "was participating in good faith in a review of the services of a health care provider." Dr. Rechsteiner's suit was dismissed, and he appealed.

¶ 22. On May 22, 2007, the court of appeals affirmed the circuit court. *Rechsteiner,* 303 Wis. 2d 656, ¶ 1. The court reviewed Wis. Stat. § 146.37(1g) and concluded that Hazelden "is properly considered part of the overall review process." *Id.,* ¶ 12. The court found that "when a doctor is referred to an addictionology center under Spooner's bylaws, that center is brought into the review process and will impact the outcome of the review." *Id.,* ¶ 15. Thus, the immunity provision is "extended to Hazelden for its role in Spooner's peer review of Rechsteiner's behavior." *Id.,* ¶ 16.

¶ 23. The court of appeals held that the Spooner representatives "enjoy immunity for their comments to Hazelden because the center was a participant in the review process." *Id.,* ¶ 17. The court held that to survive summary judgment Dr. Rechsteiner was required to show how the allegedly defamatory statements were false, verifiable, and known to be false by those who made them. *Id.,* ¶ 21. The court further held that it was "not convinced that the character of the statements rises to the level of bad faith." *Id.,* ¶ 22.

¶ 24. The court also noted that the only claim against Hazelden was a malpractice claim for misdiagnosis, which the court was not convinced Wis. Stat. § 146.37 "is broad enough to encompass." *Id.,* ¶ 26. However, the court affirmed the trial court's decision because Hazelden offered evidence that Dr. Rechsteiner

"would have been given the same treatment, regardless of the diagnosis." *Id.*, ¶ 27. The court explained that malpractice "is actionable only if the wrong diagnosis is followed by the wrong treatment." *Id.*, ¶ 28 (citations omitted). Finally, the court of appeals held that the trial court properly exercised its discretion when it denied Dr. Rechsteiner's motion for a continuance. *Id.*, ¶ 33.

¶ 25. Dr. Rechsteiner petitioned this court for review, which we granted on September 13, 2007.

## II. ANALYSIS

A. Standards of Review

■

¶ 26. Statutory immunity: Statutory interpretation is a question of law that we review de novo. *Mallow v. Angove,* 148 Wis. 2d 324, 327, 434 N.W.2d 839 (Ct. App. 1988) (citing *Estate of Boyle v. Wickhem, Buell, Meier, Wickhem & Southworth, S.C.,* 134 Wis. 2d 214, 218, 397 N.W.2d 124 (Ct. App. 1986)).

■

¶ 27. Summary judgment: We review a grant of summary judgment de novo. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Wis. Stat. § 802.08(2).

■

¶ 28. Motion for a continuance: "The decision to grant or deny a continuance is a matter within the discretion of the trial court." *State v. Wedgeworth,* 100 Wis. 2d 514, 520, 302 N.W.2d 810 (1981) (citations omitted). A trial court's ruling on a motion for a continuance

"will be set aside only if there is evidence of an [erroneous exercise] of discretion." *Robertson-Ryan & Assocs., Inc. v. Pohlhammer,* 112 Wis. 2d 583, 587, 334 N.W.2d 246 (1983) (citations omitted). "An [erroneous exercise] of discretion exists if the trial court failed to exercise its discretion or if there was no reasonable basis for its decision." *Id.* (citations omitted). This court will sustain a circuit court's discretionary decision when that decision was "the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." *LaRocque v. LaRocque,* 139 Wis. 2d 23, 27, 406 N.W.2d 736 (1987) (citations omitted).

B. Overview

¶ 29. The principal issues in this case involve questions of statutory immunity for alleged medical negligence and defamation in the context of health care services review under Wis. Stat. § 146.37. We begin with a brief overview of medical "peer review" and the statutory provisions pertaining to it. The parties do not assert that these provisions are ambiguous.[5]

¶ 30. Medical peer review has become the principal method of evaluating the quality of patient care. Kenneth R. Kohlberg, *The Medical Peer Review Privilege: A Linchpin for Patient Safety Measures,* 86 Mass. L. Rev. 157, 157 (2002). Generally speaking, "[p]eer

---

[5] "The primary source of statutory construction is the language of the statute itself, and rules of construction are used only to determine the meaning of an ambiguous statute." *Mallow v. Angove,* 148 Wis. 2d 324, 331, 434 N.W.2d 839 (Ct. App. 1988) (citing *Estate of Boyle v. Wickhem, Buell, Meier, Wickhem & Southworth, S.C.,* 134 Wis. 2d 214, 219, 397 N.W.2d 124 (Ct. App. 1986)). Thus, the court will interpret the statute as written.

review is a process by which physicians analyze critically the medical services performed by their colleagues for the purpose of decreasing instances of medical malpractice." *Id.* (footnote omitted). Evaluation is performed "in a variety of settings, such as hospital quality assurance programs, medical societies, or managed care organizations." *Id.* (footnote omitted). Peer review serves as "one of medicine's most effective risk management and quality improvement tools" and "provides a safe forum in which medical professionals can review the quality of care and work to reduce medical errors." Lisa M. Nijm, *Pitfalls of Peer Review,* 24 J. Legal Med. 541, 541 (2003) (hereinafter Nijm).

¶ 31. Almost every state has adopted a "peer review statute" to protect the work of medical peer review committees. *See* Charles D. Creech, Comment, *The Medical Review Committee Privilege: A Jurisdictional Survey,* 67 N.C. L. Rev. 179, 179 (1988). "State legislatures have attempted to encourage good faith peer review by passing various statutes that provide civil tort immunity to peer review participants, that grant a peer review information privilege in certain judicial proceedings, and that require confidentiality on the part of all peer review participants." Nijm, *supra,* at 542. "By its very nature, peer review may lead to legal action" because "a physician may decide to sue the peer review board or the hospital overseeing the process." *Id.* at 549. In enacting Wis. Stat. § 146.37, Wisconsin has joined the ranks of those jurisdictions recognizing the critical need for frank, confidential, and objective review of health care services.

¶ 32. Wisconsin Stat. § 146.37 is entitled "Health care services review; civil immunity." As noted above, this statute is commonly referred to as Wisconsin's

"peer review statute." *See Harris v. Bellin Mem'l Hosp.,* 13 F.3d 1082, 1086 (7th Cir. 1994). Wisconsin Stat. § 146.37(1g) provides in relevant part:

> [N]o person acting in good faith who participates in the review or evaluation of the services of health care providers . . . is liable for any civil damages as a result of any act or omission by such person in the course of such review or evaluation. Acts and omissions . . . include, but are not limited to, acts or omissions by peer review committees or hospital governing bodies in censuring, reprimanding, limiting or revoking hospital staff privileges . . . or taking any other disciplinary action against a health care provider.

"The clear purpose of [§ 146.37] is to improve the quality of health care by encouraging persons to participate in the review of health care providers." *Limjoco v. Schenck,* 169 Wis. 2d 703, 711, 486 N.W.2d 567 (Ct. App. 1992). The statute accomplishes this purpose by "freeing such persons from fear of a lawsuit through a grant of immunity to those who participate in such a review in good faith." *Id.*

¶ 33. The "good faith" of any person whose actions are immune under Wis. Stat. § 146.37(1g) "shall be presumed in any civil action." Wis. Stat. § 146.37(1m). One seeking to overcome this presumption of good faith must do so by "clear and convincing evidence." *Id.* Thus, Wisconsin's peer review statute affords defendants in cases arising out of medical peer review a defense to civil liability when the review was conducted in good faith. *See Harris,* 13 F.3d at 1086 (citing *Qasem v. Kozarek,* 716 F.2d 1172, 1179 (7th Cir. 1983)).

¶ 34. Wisconsin Stat. § 146.38 complements § 146.37 and fosters the important policy of maintaining confidentiality in the review of health care services. Wisconsin Stat. § 146.38(1m) states: "No person who

participates in the review or evaluation of the services of health care providers or facilities or charges for such services may disclose any information acquired in connection with such review or evaluation except as provided in sub. (3)." Subsection 3 of § 146.38 provides that information acquired in conjunction with the review and evaluation of health care services may be released to the reviewed provider or facility, to another person with the consent of the reviewee, to the person requesting the review, with limitations, and to an examining or licensing board or agency. § 146.38(3)(a), (b), (c), and (f). Additionally, such information may be revealed in certain court proceedings after the issuance of a subpoena. § 146.38(3)(dm) and (e).

¶ 35. The purpose of Wis. Stat. §§ 146.37 and 146.38 is "to encourage hospitals to perform quality-control reviews aimed at improving, prospectively, their services." *Hofflander v. St. Catherine's Hosp., Inc.*, 2003 WI 77, ¶ 119, 262 Wis. 2d 539, 664 N.W.2d 545 (citations omitted). Sections 146.37 and 146.38 "were enacted to protect the confidentiality of the peer review process, in the hope that confidentiality would encourage free and open discussion, among physicians knowledgeable in an area, of the quality of treatment rendered by other physicians." *State ex rel. Good Samaritan Med. Ctr.-Deaconess Hosp. Campus v. Moroney*, 123 Wis. 2d 89, 98, 365 N.W.2d 887 (Ct. App. 1985). Wisconsin Stat. § 146.37 is a statute designed to immunize persons involved in the review of medical services and the performance of medical service providers while ensuring that the professional reputations of evaluated providers are preserved. The scheme facilitates a proactive approach to evaluating and improving health care services for patients.

561

¶ 36. Wisconsin Stat. § 146.37 is broad in terms of the persons entitled to immunity from civil liability for their good faith review of medical services. The statute provides that "*no person* acting in good faith *who participates in the review or evaluation of the services of health care providers* . . . is liable for any civil damages as a result of any act or omission by such person in the course of such review or evaluation." § 146.37(1g) (emphasis added). Immunity under the statute is extended to good faith acts or omissions of "peer review committees or hospital governing bodies," but immunity is "not limited to" acts or omissions of these enumerated bodies. *Id.* The scope of § 146.37(1g) is intentionally broad and *not limited to* "peer" professionals, such as physicians, surgeons, and the like.

¶ 37. The breadth of Wis. Stat. § 146.37 is evident when contrasted with similar provisions from other states that define the persons or entities covered by immunity. For example, the Indiana Code provides immunity for review of the performance of medical personnel and medical services, but such immunity is limited to those bodies falling within the definition of a "peer review committee"[6] and "an organization, or any

---

[6] Indiana Code Ann. § 34-6-2-99 (2007) defines "peer review committee" for purposes of immunity from civil liability for the review of medical services. A committee must satisfy several criteria for its actions to qualify for immunity.

First, the committee must be organized in one of eight enumerated ways, including: by a state, regional, or local organization of professional health care providers; by the professional staff of a hospital, another health care facility, a nonprofit health care organization, or a professional health care organization; by state or federal law or regulation; by a governing board of a hospital, a nonprofit health care organization, or professional health care organization; as a governing board or

562

other person who, in good faith and as a witness or in some other capacity, furnishes records, information, or assistance to a peer review committee." Ind. Code Ann. § 34–30–15–15 to 20 (2007). Other states also expressly limit immunity by defining the types of covered entities. *See, e.g.,* Mo. Rev. Stat. § 537.035(1), (2) (2007) (defining "peer review committee" for purposes of immunity from civil liability); Tenn. Code Ann. § 63–6–219(c) (LexisNexis 2004) (defining "medical review committee" and "peer review committee" for purposes of immunity from civil liability).

¶ 38. Review or evaluation of the medical services provided by a particular physician can come in different forms and involve numerous parties. In 1985 the court of appeals noted that "[e]xamples of peer reviews include that done by the medical records committee, required by Wis. Admin. Code, sec. H 24.04(1)(m) to

committee of the board of a hospital, a nonprofit health care organization, or professional health care organization; by an organization, a plan, or a program described in this chapter; as a hospital or a nonprofit health care organization medical staff or a section of that staff; or as a governing board or committee of the board of a professional health care provider. Ind. Code Ann. § 34–6–2–99(2)(A)(2007).

Second, at least 50 percent of "peer review committee" members must be: (1) individual professional health care providers, the governing board of a hospital, the governing board of a nonprofit health care organization, or professional health care organization, or the governing board or a committee of the board of a professional health care provider; or (2) individual professional health care providers and the committee is organized as an interdisciplinary committee to conduct evaluation of patient care services. Ind. Code Ann. § 34–6–2–99(2)(B)(2007).

Wisconsin's immunity statute is broader than Indiana's because the Wisconsin scheme does not include a limiting definition or the factors noted above.

'review and evaluate the quality of medical care given the patient;' by the tissue committee, required by sec. H 24.04(1)(n) to 'review and evaluate all surgery performed in the hospital;' and by the medical staff at meetings held to 'review, analyze, and evaluate the clinical work of its members.' Sec. H 24.04(1)(o)." *Good Samaritan*, 123 Wis. 2d at 98. Changes to Wisconsin's peer review statute over time have expanded its scope.

¶ 39. In the 1985 case, the court of appeals held that a hospital "governing body's consideration of whether to reappoint a physician to the hospital staff [was] not a 'review or evaluation of the services of a health care provider' " within the meaning of Wis. Stat. § 146.38. *Good Samaritan*, 123 Wis. 2d at 98.[7] The *Good Samaritan* court distinguished the physician reappointment decision of a hospital governing body from a medical services review aimed at improving the quality of treatment. *Id.* at 98–99. In doing so, the court of appeals evaluated a hospital's bylaws and noted the governing body in question would consider not only the physician's "professional competence and clinical judgment," but also the physician's " 'ethics, conduct and compatibility,' . . . the physician's cooperation with hospital authorities and personnel, the physician's use of hospital facilities for his or her patients, the physician's relations with other staff members, and the physician's 'general attitude' toward his or her practice, patients,

---

[7] Both Wis. Stat. §§ 146.37 and 146.38 were created by ch. 187, Laws of 1975, to address evaluation of the services of health care providers. *State ex rel. Good Samaritan Med. Ctr.-Deaconess Hosp. Campus v. Moroney*, 123 Wis. 2d 89, 96, 365 N.W.2d 887 (Ct. App. 1985). Wisconsin Stat. § 146.37 grants civil liability immunity to those participating in an evaluation, while Wis. Stat. § 146.38 relates to the confidentiality of information relating to an evaluation.

the hospital and the general public." *Id.* at 99. The court recognized that "[i]t is apparent that a decision to reappoint need not turn on the quality of the treatment provided by the physician. Further, there is no indication that improving the quality of that treatment is a goal of the reappointment procedure." *Id.* The *Good Samaritan* court concluded that the hospital governing body's decision whether to reappoint a physician to its staff was "one step removed from the actual peer review"; therefore, the governing body's decision-making was not protected by § 146.38. *Id.* at 99–100.

¶ 40. After *Good Samaritan,* the legislature amended Wis. Stat. § 146.37(1) expansively to include a sentence that reads in part: "Acts and omissions to which this subsection applies include, *but are not limited to,* acts or omissions by peer review committees or hospital governing bodies." 1985 Wis. Act 340, § 13t (emphasis added). The court of appeals subsequently recognized that "[t]his amendment specifically extended the statutory immunity to acts or omissions by peer review committees or hospital governing bodies." *Mallow,* 148 Wis. 2d at 330.[8] The legislature also added § 146.37(1m) in 1985. This paragraph established a presumption of good faith, which will be overcome only by clear and convincing evidence. 1985 Wis. Act 340, § 14.

¶ 41. The court of appeals applied Wis. Stat. § 146.37, as revised, in *Limjoco,* a case involving claims

---

[8] *Mallow* involved a question of the applicability of the confidentiality provisions of Wis. Stat. § 146.38 to the discoverability of certain information regarding the suspension of a physician. *Mallow,* 148 Wis. 2d at 326–27. The *Mallow* court interpreted the 1985 amendment to Wis. Stat. § 146.37 and concluded that the amendment was not intended to apply to § 146.38. *Id.* at 330–31.

of conspiracy and tortious interference with contract. *Limjoco*, 169 Wis. 2d at 707. The question in *Limjoco* was whether two surgeons who reviewed the work of surgeon Dr. Uriel Limjoco (Dr. Limjoco) acted in good faith. *Id*. Drs. Jeffrey and Beth Schenck (the Schencks) were enlisted by the Falls Medical Group's (clinic) executive committee to review the files of 22 of Dr. Limjoco's patients for irregularities. *Id*. Specifically, Dr. Gary Stewart (Stewart), the clinic's quality assurance director, enlisted the Schencks to provide opinions regarding whether certain cases had been handled appropriately. *Id*. After Dr. Limjoco resigned from his post with the clinic, he sued Stewart and the Schencks and argued that they participated in destroying his professional reputation as a surgeon. *Id*. at 708.

¶ 42. The Schencks moved for summary judgment on the ground that Wis. Stat. § 146.37 immunized their participation in the good faith review of Dr. Limjoco's medical services. *Id*. at 708–09. Dr. Limjoco argued that the informal review procedure undertaken by the clinic was an "ad hoc investigation" that did not have the characteristics of a peer review. *Id*. at 709. Dr. Limjoco asserted that the Schencks' investigation had no requirements for record keeping, gave him no opportunity to be heard, was intended to terminate his association with the clinic to increase the earnings of other clinic doctors, and did not have a remedial health care objective. *Id*. at 710.

¶ 43. The court of appeals upheld summary judgment to the Schencks on the grounds that they had every right to believe they were acting within a legitimate peer review program and that there was no triable dispute regarding their good faith. *Id*. at 712–13. The court held that the purpose of Wis. Stat. § 146.37 would be defeated and would "create a trap for the unwary to

566

deny immunity to a good faith participant in medical peer review even if the peer review program itself was not organized and conducted in the proper manner, if indeed there is a 'proper' manner." *Id.* at 711–12. The court of appeals also rejected the assertion that the presumption of good faith attaches only when the review committee is "correctly organized." *Id.* at 712. "[A]nyone who has the good faith belief that they are participating in a valid peer review procedure of a health care provider is entitled to the presumption of good faith in sec. 146.37(1g), Stats., and is immune from liability, unless the presumption of good faith is overcome." *Id.*

¶ 44. The court next analyzed the good faith of the Schencks and concluded that Dr. Limjoco failed to present facts or competing inferences that the Schencks' review of his surgeries was not in good faith. *Id.* at 713–14. Dr. Limjoco claimed that Dr. Jeffrey Schenck held a "grudge" against him, which also impacted Dr. Beth Schenck's evaluation. *Id.* Dr. Limjoco also argued that the Schencks had an economic motive to see him removed from the clinic to further their financial interests. Id. The court of appeals found that Dr. Limjoco's assertions could not rebut the presumption of good faith that the Schencks enjoyed under Wis. Stat. § 146.37. *Id.* at 714–15.

¶ 45. The *Limjoco* case is instructive because it emphasizes two vital elements of Wis. Stat. § 146.37: (1) the broad reach of the activities and actors that might constitute and perform qualified review of medical services subject to immunity from civil suit under § 146.37(1g); and (2) the strength of the presumption of good faith in § 146.37(1m). Although *Limjoco* involved what one would think of as traditional "peer review," the case also illustrates that actors outside the core medical

services review committee are often called upon to evaluate the competency and characteristics of the medical professional or the medical services in question. Persons outside the review committee can become an integral part of the overall review process.

¶ 46. We now turn to the questions of immunity for Hazelden and the Spooner defendants.

C. Statutory Immunity for Hazelden

¶ 47. The first issue is whether Hazelden, a third-party addictionology center, is too removed from the peer review process initiated by Spooner to be *eligible* for immunity under Wis. Stat. § 146.37.

¶ 48. Dr. Rechsteiner asserts that Hazelden was not a part of the medical peer review process conducted by Spooner and should not be granted immunity from civil liability under Wis. Stat. § 146.37(1g). Dr. Rechsteiner contends that § 146.37(1g) provides immunity only to persons reviewing or evaluating the services of a health care provider, or the charges for those services, in connection with specifically organized programs, to improve the quality of health care. Dr. Rechsteiner reasons that Hazelden is not immune from his claim of medical negligence inasmuch as Hazelden did not evaluate the services he provided as a surgeon; it evaluated Dr. Rechsteiner personally to determine whether he had an alcohol dependency problem. This, Dr. Rechsteiner asserts, is not the type of evaluation covered by § 146.37(1g).

¶ 49. By contrast, Hazelden argues that the circuit court was correct in concluding that an outside agency enlisted by a hospital to assist with peer review is entitled to immunity under Wis. Stat. § 146.37. Hazelden notes that this court construed § 146.38 to

568

apply to organizations other than a hospital review committee in *Hofflander.* Hazelden further asserts that Spooner needed to bring in an outside expert to assess the care that Dr. Rechsteiner was providing. Hazelden insists that the peer review statute does not apply solely to the technical quality of a physician's services because the legislature chose not to use such limiting language.

¶ 50. Dr. Rechsteiner bases his argument in part on *Franzen v. Children's Hospital of Wisconsin, Inc.,* 169 Wis. 2d 366, 485 N.W.2d 603 (Ct. App. 1992), a case in which the court of appeals stated that if a review committee was formed for the purpose of monitoring a physician's handling of addictive drugs, the activity would be "one step removed from the actual peer review." *Id.* at 393 (footnote omitted). *Franzen* involved an action for medical malpractice where the plaintiff sought, and was denied access through discovery, to the defendant physician's "credentials file" that was in the possession of his hospital. *Id.* at 373–74. The plaintiff's discovery request was denied by the circuit court on the ground that the file was generated in the course of peer review and therefore constituted privileged information protected from disclosure by Wis. Stat. § 146.38. *Id.* at 374. The court of appeals remanded the discovery issue to determine the nature of the committee that produced the credentials file to ascertain whether material generated was privileged under § 146.38. *Id.* at 393.

¶ 51. *Franzen* does not aid Dr. Rechsteiner's argument because that case turned on a determination of whether an "ad hoc" committee organized to review a physician's compliance with the conditions of his reinstatement, namely his handling of addictive drugs, was indeed acting to improve the quality of health care *as contemplated by Wis. Stat. § 146.38. Id.* at 392–93. *Franzen* is distinguishable because the question there

involved the interpretation of the nature of a reviewing committee under § 146.38. *Franzen,* 169 Wis. 2d at 377. As noted above, the statutory language of § 146.38 is similar to § 146.37; however, a 1985 amendment to § 146.37 extended statutory immunity to acts or omissions by peer review committees or hospital governing bodies. *Mallow,* 148 Wis. 2d at 330. The immunity afforded to acts or omissions under § 146.37 appears to be more inclusive than the privilege from civil discovery under § 146.38. *Mallow,* 148 Wis. 2d at 331. If *Franzen* had involved a question of civil immunity under § 146.37, the result might have been different.

¶ 52. In the case at hand, Dr. Rechsteiner acknowledges that Wis. Stat. § 146.37 would "apply to Spooner Health System's review and evaluation of Rechsteiner's services." Realistically, however, a review of Dr. Rechsteiner and his services would be incomplete if it focused solely on past performance. The Spooner Board convened to review Dr. Rechsteiner's ability to perform as an on-call physician in light of the March 8, 2003, snowmobile incident. The Board's concern was understandably focused on the surgeon's future performance. The actions of a hospital governing body in reviewing the ability of a physician to perform services, especially a physician who is frequently on call 24 hours per day, qualify for the immunity contemplated by § 146.37(1g). *See Mallow,* 148 Wis. 2d at 330. There is no dispute here that the Board was evaluating not only Dr. Rechsteiner's past performance but also his future ability to perform while on call.

¶ 53. Although Spooner qualifies for immunity under Wis. Stat. § 146.37, the question remains whether Hazelden's actions are also eligible for immunity. Dr. Rechsteiner asserts that Hazelden is "one step removed" from the peer review process. *See Good*

570

*Samaritan,* 123 Wis. 2d at 99; *Franzen,* 169 Wis. 2d at 393. However, the record provides ample support for the conclusion that Hazelden was an integral part of a "review or evaluation of the services of [a] health care provider[]," as contemplated by § 146.37(1g).

¶ 54. The facts concerning Spooner's enlistment of Hazelden illustrate the point. After receiving a sheriff's incident report and learning that Dr. Rechsteiner's blood alcohol content was .06 percent during a time when he was on call for surgical coverage, the Spooner Board informed Dr. Rechsteiner that his actions warranted corrective action. The Board notified Dr. Rechsteiner by letter that under the "Corrective Action Procedures and Fair Hearing Plan Addendum" of Spooner's bylaws, a physician may request a voluntary leave of absence or face suspension of his clinical privileges until he "successfully undergo[es] an assessment process through a recognized addictionology center skilled in evaluating impaired professionals, as selected by the Board."

¶ 55. According to the letter referencing Spooner's bylaws, a physician must successfully undergo an assessment process and "demonstrate compliance with any follow-up recommendations issued as a result of that process and [must be] cleared to resume practice to the satisfaction of the Medical Staff and Board" before the physician will be considered for reinstatement. In addition, the letter indicated that Spooner's bylaws require that a physician must "authorize Spooner Health Systems to release information to the assessment program and authorize the assessment program to release its results, any recommendations made as a result of the assessment, and information on [his] compliance with any recommendations."

¶ 56. These requirements indicate that once the Board selected a "recognized addictionology center"—

Hazelden—Dr. Rechsteiner was required to successfully undergo an assessment process unless he chose to take a voluntary leave of absence. The enlistment of Hazelden to evaluate Dr. Rechsteiner is analogous to the enlistment of the two reviewing surgeons to evaluate Dr. Limjoco. *Limjoco,* 169 Wis. 2d at 711–12. However, Spooner did not have "a recognized addictionology center" in house. It had to look beyond its own staff. We would defeat the purpose of Wis. Stat. § 146.37 if we held that the participation of an outside entity—enlisted by a reviewing committee to perform an assessment of the abilities of a physician to perform effectively while on call—is not eligible for immunity simply because the outside entity is not part of a formal "peer review program." *See id.* at 711–12.

¶ 57. Although the Board initiated the review process by meeting to "consider the [sheriff's incident report] and determine what, if any, evaluation of Dr. Rechsteiner's conduct was necessary," the review process did not end there. The letter Spooner sent to Dr. Rechsteiner indicated that an addictionology center would be brought into the review process unless Dr. Rechsteiner chose to take a voluntary leave of absence. By deciding to accept and participate in the assessment option, Dr. Rechsteiner effectively approved the scope and length of the peer review process with Hazelden. Thus, Hazelden became an integral part of the ongoing medical services review, and its actions are eligible for immunity from civil liability under Wis. Stat. § 146.37.

¶ 58. Dr. Rechsteiner contends, however, that if Hazelden is eligible for immunity it lost that immunity by acts of medical negligence, namely, a misdiagnosis of his condition, resulting in damages. The court of appeals bought into this contention, in part, when it

concluded that Wis. Stat. § 146.37 is not broad enough to immunize a medical malpractice claim. *Rechsteiner,* 303 Wis. 2d 656, ¶ 26. Consequently, the court of appeals affirmed summary judgment to Hazelden on different grounds. *See id.,* ¶ 28. It examined the standard for liability arising from misdiagnosis and cited authority for the proposition that "[m]alpractice is actionable only if the wrong diagnosis is followed by the wrong treatment." *Id.* (citing *Ehlinger v. Sipes,* 148 Wis. 2d 260, 265, 434 N.W.2d 825 (Ct. App. 1988), *aff'd in part and remanded,* 155 Wis. 2d 1, 454 N.W.2d 754 (1990); *McManus v. Donlin,* 23 Wis. 2d 289, 295, 127 N.W.2d 22 (1964)).

¶ 59. The court of appeals appears to have concluded that Wis. Stat. § 146.37 does not immunize medical negligence in any form during the peer review process. *See Rechsteiner,* 303 Wis. 2d 656, ¶ 26. Our second question tests this conclusion: Does Hazelden's *diagnosis* of Dr. Rechsteiner during the medical peer review process qualify for immunity, under Wis. Stat. § 146.37, even if its diagnosis is deemed negligent? In answering this question, our task is merely to decide whether Hazelden's actions in this case are immune from civil liability under § 146.37.

¶ 60. Dr. Rechsteiner's complaint points to Hazelden's alleged negligence in diagnosis. He claims that a misdiagnosis—"alcohol dependence" instead of "alcohol abuse"—led to unnecessary treatment that cost him time, money, and reputation.

¶ 61. We conclude that Hazelden's diagnosis of Dr. Rechsteiner's condition was indistinguishable from Spooner's review, evaluation, and analysis of Dr. Rechsteiner's ability to perform as an on-call surgeon. In this case, diagnosis was the essence of the peer review

process initiated by Spooner.[9] Even if we were to assume that Hazelden's diagnosis was negligent, it was immune because it was central to the peer review process.

¶ 62. We would seriously undermine the peer review process if we denied immunity to a good faith diagnosis on these facts, especially when that diagnosis did not make an existing medical condition worse.

¶ 63. Dr. Rechsteiner contends that Hazelden's alleged misdiagnosis led to unnecessary treatment that caused damages. This brings us to the third question: Does Hazelden's treatment of Dr. Rechsteiner, following its diagnosis of his medical condition, qualify for immunity under Wis. Stat. § 146.37? To the extent Dr. Rechsteiner's claim implicates treatment, we decline to examine or decide whether *treatment* related to the peer review process can qualify for immunity.

¶ 64. If the focus is shifted from diagnosis to treatment, Hazelden asserts that summary judgment was appropriate. Hazelden contends that Dr. Rech-

---

[9] We note that diagnosis is an art rather than a science when it involves a condition that is not precisely identifiable by lab tests or irrefutable markers. Diagnosing degrees of alcoholism is an inexact science because it is subject to so many variables. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) § 305.00, at 214 (4th ed., text rev., 2000) (noting: (1) that Alcohol Abuse "requires fewer symptoms and, thus, may be less severe than Dependence and is only diagnosed once the absence of Dependence has been established."; and (2) that "[w]hen . . . problems are accompanied by evidence of tolerance, withdrawal, or compulsive behavior related to alcohol use, a diagnosis of Alcohol Dependence, rather than Alcohol Abuse, should be considered. However, since some symptoms of tolerance, withdrawal, or compulsive use can occur in individuals with Abuse but not Dependence, it is important to determine whether the full criteria for Dependence are met.").

steiner would have received the same treatment regardless of whether he received a diagnosis of "alcohol dependence" or a diagnosis of "alcohol abuse." It claims that Dr. Rechsteiner failed to produce any competent evidence that its alleged misdiagnosis led to improper treatment. It reasons that Dr. Rechsteiner's claim must fail as a matter of law because he expressly agreed to follow Hazelden's treatment recommendations, whatever they might be.

¶ 65. Dr. Rechsteiner disputes Hazelden's contention that he would have received the same treatment regardless of diagnosis. He argues that Hazelden was simply trying to protect itself from liability by sending him a letter that stated that the treatment he received would have been the same if he had received a diagnosis of alcohol abuse rather than alcohol dependence.[10]

¶ 66. Dr. Rechsteiner claims that evidence from an expert in alcohol treatment, as well as information on Hazelden's own website, create a factual issue regarding the effect of Hazelden's misdiagnosis. Dr. Rechsteiner provided evidence from Scott Hansen, an AODA Supervisor from Luther Midelfort, who conducted an assessment of Dr. Rechsteiner after his assessment and treatment at Hazelden. In a letter to the Wisconsin Medical Society, Hansen stated that "[i]n 28 years, I've never seen a patient [with] an Alcohol Abuse diagnosis require a 30–day inpatient program. With an Alcohol Abuse diagnosis, I usually recommend educational counseling sessions, at most." Dr. Rechsteiner also points to Hazelden's website, which describes the possibility of outpatient treatment services for appropriate candidates.

---

[10] This assertion is different from an allegation that Hazelden did not act in good faith in making its diagnosis.

¶ 67. Here again, if we assume for analysis that Hazelden's diagnosis of "alcohol dependence" instead of "alcohol abuse" was negligent, Dr. Rechsteiner still failed to claim that his *treatment* was substandard or negligent or aggravated his medical condition. "A misdiagnosis, in and of itself, is not, and cannot, be an actionable injury. . . . The actionable injury arises when the misdiagnosis causes a greater harm than existed at the time of the misdiagnosis." *Paul v. Skemp*, 2001 WI 42, ¶ 25, 242 Wis. 2d 507, 625 N.W.2d 860.

¶ 68. In affirming summary judgment to Hazelden, the court of appeals emphasized that Hazelden submitted evidence that Hazelden would have given Dr. Rechsteiner the same 28 days of inpatient treatment regardless of whether he had been diagnosed with "alcohol abuse" or "alcohol dependence." *Rechsteiner*, 303 Wis. 2d 656, ¶ 27. As this case played out, there is no genuine issue of material fact as to whether Dr. Rechsteiner would have received inpatient treatment at Hazelden if he had been diagnosed with only "alcohol abuse."

¶ 69. The *letter* from Scott Hansen, which stated that Hansen had never seen an individual with a correct diagnosis of "alcohol abuse" undergo the type of treatment provided by Hazelden, does not create a genuine issue of material fact about whether Hazelden failed to satisfy the standard of care with regard to treatment of Dr. Rechsteiner. The letter does not assert that there is a specific standard of care for all patients diagnosed with alcohol abuse. It does not rule out alternative methods of treatment, including inpatient treatment, for patients diagnosed with alcohol abuse. Moreover, as the court of appeals observed, the letter "does not state how *this* patient in *this* case would be

treated, only that he had never seen an alcohol abuse patient go through inpatient treatment." *Rechsteiner*, 303 Wis. 2d 656, ¶ 28. Hansen's letter is "speculative" in the sense that it invites. the court to second-guess Dr. Rechsteiner's treatment without established standards. *See id.* Because the evidence presented by Dr. Rechsteiner does not create a genuine issue of material fact regarding whether his treatment at Hazelden would have or should have differed with a diagnosis of "alcohol abuse," his claim for medical negligence cannot survive summary judgment.

¶ 70. We emphasize that our holding regarding Hazelden is heavily influenced by the facts and circumstances of this case. Like the court of appeals, we are not prepared to say that the peer review statute will immunize medical negligence in all situations, irrespective of the circumstances.

¶ 71. We conclude that the record before us indicates that Hazelden is eligible for immunity under Wis. Stat. § 146.37 because it played an integral role in Spooner's medical peer review process. Hazelden's medical diagnosis of Dr. Rechsteiner is immune, even if its diagnosis is deemed negligent, because Hazelden's diagnosis was central to its requested evaluation. If Dr. Rechsteiner's complaint is viewed as focusing on Hazelden's treatment of Dr. Rechsteiner, as opposed to its diagnosis of Dr. Rechsteiner, the complaint cannot survive summary judgment.

D. Statutory Immunity for the Spooner Defendants

¶ 72. Dr. Rechsteiner's claims against the Spooner defendants involve allegations that members of Spooner's Board defamed him and negligently commu-

nicated false information when they made statements about him to Hazelden staff.[11]

¶ 73. The Spooner defendants argue that Wis. Stat. § 146.37(1g) is to be interpreted broadly to protect the statements of participants involved in a medical peer review process. They point out that the language of § 146.37(1g) does not limit the persons granted immunity and insist that the Board, which initiated the peer review of Dr. Rechsteiner, constitutes an entity whose actions are immune under § 146.37. Furthermore, the Spooner defendants explain that when the Board was presented with the sheriff's incident report, it took a proactive approach in Dr. Rechsteiner's assessment, which is exactly what was envisioned by the legislature to prevent patient harm.

¶ 74. Dr. Rechsteiner argues that the employees and agents of Spooner, including Schafer, Cuskey, Long, and Stewart, are not immune from liability because Wis. Stat. § 146.37(1g) does not extend beyond the Board's own evaluation of his medical services. Dr. Rechsteiner emphasizes the fact that these defendants, who allegedly defamed him, are not surgeons or even physicians. Thus, he argues that they are not qualified to discuss the quality of treatment rendered by him. Furthermore, he contends that the statements the Spooner defendants made to Hazelden pertained to his personal life, rather than the quality of medical services

---

[11] An action for defamation is established by proving the following elements:

> (1) a false statement; (2) communicated by speech, conduct or in writing to a person other than the person defamed; and, (3) the communication is unprivileged and tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her.

*Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 534, 563 N.W.2d 472 (1997) (citations omitted).

he provides. Dr. Rechsteiner's assertions bring us to the fourth question: Do the actions and statements of the Spooner defendants qualify for immunity under Wis. Stat. § 146.37?

¶ 75. Wisconsin Stat. § 146.37(1g) states that "no person acting in good faith who participates in the review or evaluation of the services of health care providers . . . is liable for any civil damages." In enacting this provision, the legislature chose not to distinguish between different classes of persons who enjoy immunity. Rather, the legislature extended immunity to *any* participating person acting in good faith. § 146.37(1g). The good faith of such persons is presumed. § 146.37(1m). Furthermore, § 146.37(1g) explicitly provides that immunity extends to the acts and omissions of "peer review committees or hospital governing bodies in censuring, reprimanding, limiting or revoking hospital staff privileges." § 146.37(1g); *see also Mallow,* 148 Wis. 2d at 330.

■■■

¶ 76. Wisconsin Stat. 146.37(1g) plainly applies to the actions of the Spooner Health System, the Spooner Board, its individual members (Cuskey, Long, and Stewart), and Spooner administrator/CEO Schafer in their review and evaluation of Dr. Rechsteiner's services and to any disciplinary action taken against him, so long as they were acting in good faith. As Dr. Rechsteiner acknowledges, "disciplinary action taken by a governing body will be necessarily linked to the review of the physician's services by others knowledgeable in the same area of medicine." The Spooner defendants' actions in temporarily suspending Dr. Rechsteiner's privileges until he completed the required assessment and treatment with Hazelden fit squarely within the underlying objective of § 146.37, namely "to encourage hospitals to perform quality-control reviews aimed at improving, pro-

spectively, their services." *Hofflander,* 262 Wis. 2d 539, ¶ 119 (citations omitted). The Spooner defendants' statements to Hazelden staff helped Hazelden perform its duty to assist Spooner in reviewing and prospectively improving the performance of its on-call surgeon.

¶ 77. Dr. Rechsteiner next contends that defendants Schafer, Cuskey, Long, and Stewart did not act in good faith when making statements to Hazelden. This implicates the fifth question: Did Dr. Rechsteiner provide evidence to the court that raised a genuine issue of material fact about the good faith of the Spooner defendants? Dr. Rechsteiner concedes that there is a presumption that a person participating in a peer review process is acting in good faith, but he argues that he should survive the defendants' motions for summary judgment because he presented facts that showed a triable dispute. Dr. Rechsteiner insists that the good faith analysis is a question of fact for a jury.

¶ 78. Two subsections of Wis. Stat. § 146.37 address the nature of "good faith" for purposes of immunity from civil liability, without actually defining the term. Wisconsin Stat. § 146.37(1m) provides: "The good faith of any person specified in subs. (1g) and (3) shall be presumed in any civil action. Any person who asserts that such a person has not acted in good faith has the burden of proving that assertion by clear and convincing evidence." Wisconsin Stat. § 146.37(2) provides:

> In determining whether a member of the reviewing or evaluating organization or the medical director has acted in good faith under sub. (1g), the court shall consider whether the member or medical director has sought to prevent the health care provider or facility and its counsel from examining the documents and records used in the review or evaluation, from presenting witnesses, establishing pertinent facts and circumstances, questioning or refuting testimony and evidence,

confronting and cross-examining adverse witnesses or from receiving a copy of the final report or recommendation of the reviewing organization or medical director.

■■

¶ 79. We must keep in mind that this case comes to us on review of summary judgment. "At summary judgment ... [a plaintiff] must demonstrate only that a rational jury could find that [the plaintiff] had demonstrated lack of good faith by clear and convincing evidence." *Harris,* 13 F.3d at 1086.[12] In *Harris,* the Seventh Circuit interpreted Wis. Stat. § 146.37 and recognized that the legislature did not define "good faith" in the peer review statute. *Id.* It noted that "[o]ther courts interpreting peer review statutes similar to Wisconsin's have also held that 'good faith' is at least in part a subjective inquiry." *Id.* at 1087 (citations omitted).

¶ 80. The immunity granted in Wis. Stat. § 146.37 anticipates unvarnished candor in the course of medical services review. Protecting candor is necessary to the full and open review envisioned by the statute. To protect this candor, § 146.37(1m) creates a presumption of good faith for peer review participants. "Any person who asserts that [one covered by § 146.37(1g)] has not acted in good faith has the burden of proving that assertion by clear and convincing evidence." § 146.37(1m).

¶ 81. Dr. Rechsteiner asserts that the statements made by the defendants[13] were false and easily verifi-

---

[12] *See also Limjoco v. Schenck,* 169 Wis. 2d 703, 713, 486 N.W.2d 567 (Ct. App. 1992) ("At the summary judgment stage, [the plaintiff] simply ha[s] to present facts or alternate competing inferences sufficient to convince the trial court that there was a triable dispute regarding the [defendants'] good faith.").

[13] Dr. Rechsteiner's complaint alleges that the Spooner defendants made defamatory statements regarding his relationship with his wife, his finances, his state of well-being, his

able as false, permitting an inference that the defendants lacked good faith. For example, Dr. Rechsteiner argues that a comment that his "wife was terminated from her position at Spooner due to issues with Rechsteiner's alcohol usage was easily verifiable as false by the Spooner Board member making the statement." Dr. Rechsteiner argues that allegedly defamatory statements referred to his personal life and personality rather than the quality of his medical services. He suggests that the nature of the statements demonstrates bad faith on the part of the Spooner defendants.

¶ 82. We conclude that Dr. Rechsteiner has failed to present facts that overcome the presumption of good faith established by Wis. Stat. § 146.37(1m).[14] Dr. Rechsteiner failed to present facts that show that the defendants' statements made to Hazelden personnel were indisputably false and defamatory. Dr. Rechsteiner made conclusory assertions about the allegedly false nature of the statements.

¶ 83. More important, Dr. Rechsteiner failed to present facts that demonstrate that the Spooner defendants were not acting in good faith. For example, he did not show that the Spooner defendants knew that their statements were false. He did not allege that any of the Spooner defendants made statements to anyone other

mental state, the state of his career, and the alleged existence of lawsuits against Dr. Rechsteiner for malpractice.

[14] Dr. Rechsteiner presented an affidavit from his attorney that had appended to it transcripts of depositions of some of the Spooner defendants. Dr. Rechsteiner himself signed an affidavit that recounted the course of events leading to and including his treatment at Hazelden. Neither of these sworn affidavits included assertions regarding the falsity of the alleged defamatory statements or the Spooner defendants' knowledge regarding the falsity of the statements.

than Hazelden personnel—that is, that they made statements to people outside the peer review process. This sort of evidence is critical because when a person in Dr. Rechsteiner's position accuses one or more participants in a peer review process of defamation, he must demonstrate that there is a genuine issue of material fact as to whether the alleged statements were made in good faith. *See* Wis. Stat. § 146.37(1m).

¶ 84. Dr. Rechsteiner's assertions are similar to those proffered by the plaintiff in *Limjoco*. In *Limjoco* the plaintiff argued that the deposition testimony of one of the defendants revealed that he held a grudge against the plaintiff because he stated that "he thought Limjoco had misdiagnosed a case which resulted in a lawsuit being initiated against [the defendant]." *Limjoco,* 169 Wis. 2d at 713. The court of appeals determined that the plaintiff failed to make the defendants' good faith a disputed issue of fact "because [Limjoco] offer[ed] only conclusory statements about the grudge. . . . He [did] not present established facts from which inferences of bad faith could be drawn." *Id.* at 714–15.

¶ 85. In our view, Dr. Rechsteiner offered less evidence than the plaintiff in *Limjoco* who failed to meet the burden of demonstrating a triable issue of fact regarding the good faith of the defendants. Dr. Rechsteiner's conclusory statements do not permit his claims to survive summary judgment.

¶ 86. Dr. Rechsteiner asserts that the personal nature of the statements has nothing to do with the quality of the medical services he provided Spooner Health System. However, insight into a physician's social and personal behavior is relevant to an inquiry of alleged alcohol abuse. It was reasonable for Hazelden to gather information on Dr. Rechsteiner's personal life to

discern whether alcohol influenced his behavior and daily functioning. Since Spooner was concerned about Dr. Rechsteiner's use of alcohol during periods when he was on call, it was reasonable for Hazelden to gather information to determine whether his past behavior revealed the influence of alcohol on his personality. The defendants' statements to Hazelden in this regard do not serve as proof that the defendants did not act in good faith.

¶ 87. Lastly, Dr. Rechsteiner contends that the refusal of the defendants to answer questions during their depositions on the basis of a Wis. Stat. § 146.38[15] privilege also supports the conclusion that the Spooner defendants did not act in good faith. He argues that "under the plain language of § 146.37, this fact is unquestionably evidence of bad faith that renders summary judgment inappropriate." Dr. Rechsteiner points to the portion of § 146.37(2) that allows the court to inquire into the extent to which members of the reviewing committee seek to prevent the physician from obtaining information during the review process. Dr. Rechsteiner claims that the defendants improperly asserted a privilege in refusing to answer his questions during their depositions, which demonstrates a lack of good faith.

¶ 88. We disagree. As the Seventh Circuit recognized, good faith under Wis. Stat. § 146.37 "is at least in part a subjective inquiry." *Harris*, 13 F.3d at 1087. Thus, even if the Spooner defendants asserted an incorrect privilege, this alone is not per se proof of a lack of good

---

[15] Wisconsin Stat. § 146.38(1m) provides in relevant part: "No person who participates in the review or evaluation of the services of health care providers or facilities or charges for such services may disclose any information acquired in connection with such review or evaluation."

faith. Refusing to answer a question during a deposition on the advice of counsel does not create a genuine issue of material fact that rebuts the presumption of good faith in § 146.37(1m).

██

¶ 89. We conclude that Wis. Stat. § 146.37 applies to the actions of the Spooner defendants and immunizes them from civil liability for Dr. Rechsteiner's claims of defamation and negligent communication of false information. Dr. Rechsteiner has failed to demonstrate that there is a genuine issue of material fact as to whether the Spooner defendants were acting in good faith.

E. Dr. Rechsteiner's Motion for a Continuance

¶ 90. Finally, we come to the sixth question: Did the circuit court erroneously exercise its discretion in denying Dr. Rechsteiner's motion for a continuance? Dr. Rechsteiner asserts that the circuit court erred when it denied his motion for a continuance. He contends that the circuit court abused its discretion because he had not yet deposed certain persons before the summary judgment hearing. Dr. Rechsteiner asserts that he did not get the chance to depose representatives of Hazelden due to scheduling conflicts and that he was prevented from taking full depositions of the Spooner defendants due to their claims of privilege under Wis. Stat. § 146.38. At the time of the summary judgment hearing on April 7, 2006, Dr. Rechsteiner's motion to compel the witnesses to answer all deposition questions was pending before the court. As a consequence, Dr. Rechsteiner contends that his ability to demonstrate a lack of good faith of the individual Spooner defendants was hampered by his inability to complete discovery

prior to the summary judgment hearing. Thus, Dr. Rechsteiner argues that the court of appeals' refusal to reverse the circuit court's denial of his motion for a continuance was inequitable and inappropriate.

¶ 91. Dr. Rechsteiner also stresses that, as a practical matter, there were several months left before the discovery deadline of November 10, 2006, when the circuit court denied his motion. Dr. Rechsteiner also argues that granting his motion for a continuance would not have prejudiced the defendants because there were several months before the scheduled trial date of December 11, 2006.

¶ 92. "It is well established in Wisconsin that a continuance is not a matter of right." *Robertson-Ryan,* 112 Wis. 2d at 586 (citations omitted). The decision to deny a continuance is within the discretion of the trial court. *Id.* at 587. A circuit court's ruling on a motion for a continuance "will be set aside only if there is evidence of an [erroneous exercise] of discretion." *Id.* "An [erroneous exercise] of discretion exists if the trial court failed to exercise its discretion or if there was no reasonable basis for its decision." *Id.*

¶ 93. Several factors are to be balanced in the discretionary decision whether to grant a continuance, including: (1) the length of the delay requested; (2) whether the lead counsel has associates prepared to act in his absence; (3) whether other continuances had been requested and received; (4) the convenience or inconvenience to the parties, witnesses, and the court; and (5) whether the delay seems to be for legitimate reasons. *Mogged v. Mogged,* 2000 WI App 39, ¶ 14 n.9, 233 Wis. 2d 90, 607 N.W.2d 662 (citing *Wedgeworth,* 100 Wis. 2d at 521).

¶ 94. If we consider the *Mogged* factors, Dr. Rechsteiner appears to base his arguments on the fourth and fifth factors. He asserts that the circuit court and the parties would not have been inconvenienced by the granting of a continuance because the discovery deadline was November 10, 2006, and the trial date was scheduled for December 11, 2006. Dr. Rechsteiner implies that a continuance would not have forced the court to reschedule these dates. He also suggests that the delay was for legitimate reasons because several discovery matters were pending.

¶ 95. Although the scheduled court dates and Dr. Rechsteiner's pending discovery were relevant to the court's decision, Dr. Rechsteiner has failed to illustrate how the circuit court's exercise of discretion was erroneous. The circuit court demonstrated a reasonable exercise of discretion on the record. The court explained:

> I think given the longstanding nature of this complaint, the fact that plaintiff actively participated in the scheduling of summary judgment, and . . . the fact that there appears . . . to the court nothing remaining but legal issues to decide, that the time is ripe for summary judgment motion, especially given the scheduling order that is in place. I will hear the motions for summary judgment. And the motion for continuance is denied.

¶ 96. The expanse of time between the commencement of this action and its resolution by summary judgment was significant. Dr. Rechsteiner filed his complaint on March 29, 2005. On November 18, 2005, the Spooner defendants filed a motion for summary judgment. A hearing on this summary judgment motion was scheduled for February 7, 2006. However, that hearing was rescheduled for April 7, 2006, by the parties' agreement to a scheduling order filed January 9, 2006. On January 16, 2006, Dr. Rechsteiner's attorney deposed the

587

Spooner defendants. During those depositions, the defendants' attorney asserted privilege under Wis. Stat. § 146.38. Dr. Rechsteiner did not file a motion to compel discovery at that time. He waited to file a motion to compel until April 5.

¶ 97. Taking into consideration the course of events noted above and weighing the relevant *Mogged* factors, we conclude that the circuit court properly exercised its discretion in denying Dr. Rechsteiner's motion for a continuance. Considering the first factor, the length of the delay requested, *Mogged,* 233 Wis. 2d 90, ¶ 14 n.9, the fact that the summary judgment hearing had already been rescheduled once by agreement of the parties during the scheduling conference indicates that Dr. Rechsteiner had already received adequate time to prepare his case. This evidence also relates to the third factor—whether other continuances had been requested and received. *Id.* Finally, since Dr. Rechsteiner delayed filing his motion to compel discovery until immediately before the summary judgment hearing, the circuit court could reasonably have concluded that granting the continuance motion would unnecessarily inconvenience the court and the parties and create unnecessary delay (*Mogged* factors four and five). *Id.* Considering these factors, Dr. Rechsteiner has failed to demonstrate that the circuit court erroneously exercised its discretion in denying his motion for a continuance.

¶ 98. There is another valid reason why the circuit court's denial of Dr. Rechsteiner's motion was reasonable. It was logical for the circuit court to hear the summary judgment motion as scheduled because if there were no triable issues of fact the request for a continuance would be moot. In *Jorgensen v. Water*

*Works, Inc.,* 218 Wis. 2d 761, 582 N.W.2d 98 (Ct. App. 1998), the court of appeals recognized that a decision to take up summary judgment early on would be "based on a reasonable preference for conserving judicial resources." *Id.* at 773.

¶ 99. In *Jorgensen* the plaintiffs failed to conduct discovery because they were waiting for the court to grant their request for the appointment of a receiver to conduct discovery. *Id.* at 771. The defendants were granted summary judgment, and the plaintiffs appealed, claiming the court should have denied the motion or ordered a continuance to permit discovery. *Id.* at 771–72. The circuit court decided that it made sense to hear the summary judgment motion first, because if there were no triable issues of fact on the claims that the Jorgensens asserted, the request for the appointment of a receiver would be moot. *Id.* at 773. The court of appeals affirmed the decision as reasonable. *Id.*

¶ 100. The court of appeals noted that the scheduling order "specifically stated that the motion for summary judgment would be heard before the motion for dissolution and appointment of a receiver." *Id.* at 772. Thus, the court concluded that the Jorgensens and their counsel "had ample notice that they should be prepared to oppose the motion for summary judgment before their motion was decided." *Id.*

¶ 101. In this case, the January 6, 2006, scheduling order set the summary judgment hearing date for April 7, 2006, three months in the future. Dr. Rechsteiner was on notice that any discovery motions required to oppose a motion for summary judgment should be completed before the April date. In fact, the scheduling order specified that "all motions for summary judgment or other dispositive motions filed by

March 7, 2006, will be heard on April 7, 2006 at 10:00 a.m." However, Dr. Rechsteiner's counsel chose to wait until April 5 to file a motion to compel discovery. On these facts, we conclude that it was reasonable for the circuit court to deny Dr. Rechsteiner's motion for a continuance; therefore, the circuit court did not erroneously exercise its discretion.

## III. CONCLUSION

¶ 102. The questions presented, as we see them, together with the answers provided, are stated as follows:

Question (1): Is Hazelden, a third-party addictionology center, too removed from the peer review process initiated by Spooner to be eligible for immunity under Wis. Stat. § 146.37?

Answer (1): No. Hazelden is *eligible* for immunity under Wis. Stat. § 146.37 because it played an integral role in Spooner's medical peer review of Dr. Rechsteiner.

Question (2): Does Hazelden's diagnosis of Dr. Rechsteiner during the medical peer review process qualify for immunity, under Wis. Stat. § 146.37, even if its diagnosis is deemed negligent?

Answer (2): Yes. Hazelden's medical diagnosis of Dr. Rechsteiner is immune under Wis. Stat. § 146.37, even if the diagnosis is deemed negligent, because Hazelden's diagnosis was made in good faith and was central to a requested evaluation of Dr. Rechsteiner in peer review.

Question (3): Does Hazelden's treatment of Dr. Rechsteiner, following its diagnosis of his medical condition, qualify for immunity under Wis. Stat. § 146.37?

Answer (3): The court is not required to decide whether treatment related to the peer review process qualifies for immunity. If Dr. Rechsteiner's complaint is

viewed as focusing on Hazelden's treatment of Dr. Rechsteiner, as opposed to its diagnosis of Dr. Rechsteiner, his complaint cannot survive a motion for summary judgment on the facts of this case.

Question (4): Do the actions and statements of the Spooner defendants qualify for immunity under Wis. Stat. § 146.37?

Answer (4): Yes. The actions and words of the Spooner defendants are immune under Wis. Stat. § 146.37 because they were part of Dr. Rechsteiner's peer review and because the Spooner defendants were presumed to be acting in good faith.

Question (5): Did Dr. Rechsteiner provide evidence to the court that raised a genuine issue of material fact about the good faith of the Spooner defendants?

Answer (5): No.

Question (6): Did the circuit court erroneously exercise its discretion in denying Dr. Rechsteiner's motion for a continuance?

Answer (6): No.

¶ 103. Accordingly, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 104. LOUIS B. BUTLER, JR., J., did not participate.