# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP2357-LV |

| | |
|---|---|
| COMPLETE TITLE: | In the matter of the commitment of:<br><br>State of Wisconsin,<br>　　　　　Petitioner-Petitioner,<br>　　v.<br>Anthony James Jendusa,<br>　　　　　Respondent-Respondent. |

REVIEW OF DECISION OF THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | March 10, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 26, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Joseph R. Wall |

JUSTICES:

DALLET, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. ZIEGLER, J., filed a dissenting opinion, in which ROGGENSACK, C.J., and REBECCA GRASSL BRADLEY, J., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the petitioner-petitioner, there were briefs filed by *Lisa E.F. Kumfer*, assistant attorney general; with whom on the briefs was *Joshua L. Kaul,* attorney general. There was an oral argument by *Lisa E.F. Kumfer*.

For the respondent-respondent, there was a brief filed by *Dustin C. Haskell* assistant state public defender. There was an oral argument by *Dustin C. Haskell*.

**2021 WI 24**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP2357-LV
(L.C. No. 2016CI5)

STATE OF WISCONSIN : IN SUPREME COURT

In the matter of the commitment of:

State of Wisconsin,

      Petitioner-Petitioner,

   v.

Anthony James Jendusa,

      Respondent-Respondent.

**FILED**

**MAR 10, 2021**

Sheila T. Reiff
Clerk of Supreme Court

DALLET, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. ZIEGLER, J., filed a dissenting opinion, in which ROGGENSACK, C.J., and REBECCA GRASSL BRADLEY, J., joined.

REVIEW of an order of the Court of Appeals. *Affirmed and cause remanded.*

¶1 REBECCA FRANK DALLET, J. Anthony Jendusa seeks discovery of a Wisconsin Department of Corrections (DOC) database in an effort to challenge the sexually violent person commitment proceeding initiated against him over four years ago. Jendusa believes that the DOC's Wisconsin-specific data provides a more relevant basis upon which to calculate his risk of

engaging in future acts of sexual violence——a calculation that may result in a lower estimate of his risk than that advanced by the State's expert witness.  He argues that the database is discoverable pursuant to both Wis. Stat. § 980.036 (2019-20)[1] and the Fourteenth Amendment to the United States Constitution as interpreted in Brady v. Maryland, 373 U.S. 83 (1963).  The State disagrees with Jendusa's interpretation of § 980.036 and the applicability of Brady.  It further argues that disclosing the DOC database may violate state and federal health-privacy laws.

¶2   This case comes before us as a review of the court of appeals' denial of the State's petition for leave to file an interlocutory appeal of the circuit court's discovery order.[2]  We hold that the court of appeals did not erroneously exercise its discretion in denying that petition.  We nevertheless reach the underlying merits of that petition and conclude that the DOC database is discoverable pursuant to Wis. Stat. § 980.036(5).  Accordingly, we affirm the court of appeals' order and further conclude that the circuit court did not err when it granted Jendusa's discovery request.  We remand the cause to the circuit court for further proceedings consistent with this opinion.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

[2] State v. Jendusa, No. 2018AP2357-LV, unpublished order (Wis. Ct. App. July 16, 2019) (denying the State's petition for leave to appeal a non-final order of the Circuit Court for Milwaukee County, the Honorable Joseph R. Wall presiding).

2

## I.   BACKGROUND

¶3   In December 2016, the State petitioned to commit Jendusa as a sexually violent person pursuant to Wis. Stat. ch. 980.  At the probable cause hearing, Dr. Christopher Tyre, a licensed psychologist employed by the DOC, testified that Jendusa met the statutory definition of a sexually violent person.[3]  Dr. Tyre stated that he assessed Jendusa's likelihood of engaging in one or more future acts of sexual violence over Jendusa's lifetime using the Static-99 and Static-99R assessments (as informed by the Rapid Risk Assessment for Sex Offense Recidivism (RRASOR) and the Sex Offender Treatment Intervention and Progress Scale (SOTIPS)).[4]  Dr. Tyre reported

---

[3] "Sexually violent person" is defined as one "who has been convicted of a sexually violent offense . . . and who is dangerous because he or she suffers from a mental disorder that makes it likely that the person will engage in one or more acts of sexual violence."  Wis. Stat. § 980.01(7).  "Likely," in turn, means "more likely than not," § 980.01(1m), which courts interpret to mean the person has a more than 50-percent chance of engaging in a future act of sexual violence over his or her lifetime.  See State v. Richard, 2011 WI App 66, ¶3, 333 Wis. 2d 708, 799 N.W.2d 509 (citing State v. Smalley, 2007 WI App 219, ¶¶3, 10, 305 Wis. 2d 709, 741 N.W.2d 286).

[4] Sex-offender risk assessments generally fall into two categories:  those that measure "static" risk factors, and those that measure "dynamic" risk factors.  The Static-99, the Static-99R, and the RRASOR are static assessments.  The RRASOR assesses recidivism based on sexual deviance; the Static-99 and Static-99R consider six additional risk factors to assess recidivism based on a more general criminal or antisocial disposition.  Dr. Tyre testified that because the Static-99 instruments measure a person's general antisocial disposition, there is a potential for "noise" in estimating the more particularized likelihood of committing a future act of sexual violence.  He explained that the RRASOR, with its sexual deviance focus, helps him address that "noise."

his conclusions in his Special Purpose Evaluation, which was received into evidence.[5]

¶4 According to Dr. Tyre, each assessment is based on the same foundational method. Researchers observed several groups of sex offenders after their release to see whether they recidivated.[6] The proportion of those who recidivated provided the researchers with a "base rate," or the general likelihood of re-offense across the studied population. For the Static-99,

---

The SOTIPS assesses dynamic risk. Dynamic risk assessments attempt to adjust the static assessments' estimated likelihood of future sexual violence by accounting for fluid behavioral factors, such as adjustment to supervision, self-management, compliance within an institutional setting, and continued sexual interests or deviance.

[5] During the roughly three months between the initial detention order and the subsequent probable cause hearing, Dr. Tyre twice updated his Special Purpose Evaluation. Neither update changed the substance of his conclusion that Jendusa met the statutory criteria for civil commitment as a sexually violent person.

[6] For purposes of the actuarial risk assessments, "recidivism" is defined as an arrest or conviction for a new sex offense within a specified time period of 5, 10, or 15 years. In the ch. 980 context, this definition is imperfect. On the one hand, the risk assessments underestimate the likelihood of future sexual violence because numerous sex offenses go unreported or uncharged and because a ch. 980 commitment is based on an offender's lifetime risk. On the other hand, this definition overestimates the likelihood of future sexual violence because it encompasses sex offenses beyond the narrower subset of "sexually violent offense[s]" relevant to ch. 980. See Wis. Stat. § 980.01(6). For these reasons, this opinion differentiates between a "re-offense," which, like recidivism, refers to a subsequent arrest or conviction for a sex offense, and a "future act of sexual violence," which encapsulates all statutorily defined sexually violent offenses regardless of whether they are reported or result in a criminal complaint.

4

which studied Canadian and Danish offenders, the researchers observed that a small subset of the studied groups recidivated at a higher rate despite similar risk factor scores as those in the other groups. To account for this variability, the researchers divided the groups into two comparison "norms": "routine" and "high-risk/high-needs." Each norm has its own base rate, with the high-risk/high-needs norm's base rate being the higher of the two.

¶5 In order to assess an individual using one of these instruments, an examiner first determines the norm, and thus the base rate, that is the most apt comparison for the individual. The examiner then numerically scores the individual based on the presence and severity of certain risk factors that have been found to correlate positively with sexual recidivism. The sum of those scores places the individual into a risk category. The examiner then cross-references that risk category with the selected norm's base rate to calculate a range of "absolute" recidivism rates. These "absolute" rates purport to predict the likelihood that the assessed individual will commit another sex offense over future periods of time (e.g., in the next five or ten years).

¶6 Dr. Tyre testified that he assigned Jendusa the high-risk/high-needs norm and that Jendusa's total scores placed him in the high-moderate risk category on the RRASOR assessment and in the above-average risk category on the two Static-99 assessments. Applying those risk categories to the high-

risk/high-needs norm's base rate, Dr. Tyre predicted that Jendusa has the following absolute recidivism rates:

- 52 percent over 15 years (according to the Static-99);

- 33 to 37 percent over ten years (according to the Static-99R); and

- 17 to 25 percent over five years (according to the Static-99R).

Dr. Tyre stated that Jendusa's score on the SOTIPS, which additionally considered several of Jendusa's dynamic risk factors, indicated that Jendusa's absolute recidivism rate was likely slightly higher than that estimated by the Static-99 and Static-99R. Dr. Tyre also acknowledged that certain mitigating factors, such as Jendusa's age (51 years old) and his participation in sex-offender programming, slightly reduced Jendusa's likelihood to engage in future acts of sexual violence; yet Dr. Tyre ultimately concluded that Jendusa is more likely than not to engage in a future act of sexual violence.

¶7 On cross-examination, Dr. Tyre revealed that the DOC maintains a Wisconsin-specific database of individuals that it has evaluated for sexually violent person commitments and that he was in the beginning stages of analyzing this data. Dr. Tyre testified that nearly two years prior, one of his colleagues had emailed him the preliminary results of that analysis, including a Wisconsin-specific base rate, but Dr. Tyre claimed he had not

yet reviewed that email.[7] Nevertheless, he acknowledged that the Wisconsin-specific base rate could be lower than the base rates in the Static-99 or Static-99R, and that a lower base rate may affect his assessment of Jendusa's likelihood to engage in a future act of sexual violence.

¶8 Based on Dr. Tyre's evaluation, the circuit court found probable cause to believe that Jendusa is a sexually violent person, ordered the DOC to detain him, and bound him over for trial pursuant to Wis. Stat. § 980.04(3).

¶9 Jendusa then moved the circuit court to order the DOC to disclose its database so that he could have an expert analyze the Wisconsin-specific base rate citing Wis. Stat. § 980.036(2)(h), (2)(j), and (5), as well as the Fifth and Fourteenth Amendments to the United States Constitution. Jendusa argued that the database is potentially exculpatory evidence——it either tends to show he does not meet the commitment criteria or impeaches Dr. Tyre's evaluation——because the Wisconsin-specific base rate may be lower than the base rates Dr. Tyre employed to evaluate him. Application of a lower Wisconsin-specific base rate, in turn, could result in a

---

[7] Nearly two years prior to the hearing, Dr. Tyre's co-researcher compared the names of the offenders in the DOC database against Wisconsin court records in the Consolidated Court Automation Programs and produced a de-identified database containing information on who recidivated and their respective scores on various actuarial instruments. For purposes of this opinion, "de-identified" means that all personally identifying information, such as an individual's name and birthdate, is removed.

7

predicted lifetime recidivism risk below 50 percent, undermining the State's contention that Jendusa is "likely" to engage in future acts of sexual violence. Jendusa also argued that the database was exculpatory impeachment material because a Wisconsin-specific base rate may better capture unique cultural and social features not present in the Canadian and Danish samples represented in the Static-99.[8]

¶10 The State opposed disclosure on three grounds. It first argued that the database is not in the State's "possession" because it is in the DOC's possession. Second, the State argued that the database itself cannot be exculpatory since only an analysis of that data could reveal a different base rate, which may or may not be lower than the one used by Dr. Tyre. The State argued that therefore there is no statutory or constitutional requirement to disclose the data itself. Finally, the State claimed that Jendusa has an adequate alternative remedy via a research request pursuant to the DOC's Executive Directive #36 ("Directive #36"), "Human Subject Research Requests Process and Procedure." See https://doc.wi.go v/DataResearch/ConductingResearch/WIDOCExecutiveDirective36.pdf. The State maintained that because Directive #36 was developed in

---

[8] See R. Karl Hanson et al., What Sexual Recidivism Rates Are Associated with Static-99R and Static-2002R Scores?, 28 Sexual Abuse: J. Rsch. & Treatment 218, 241 (2015) (recommending that evaluators use "local STATIC norms" because they "can account for the unique cultural and social features of a specific jurisdiction").

8

accordance with state and federal health-privacy laws, it is the exclusive means of accessing such sensitive "medical" data.

¶11 In fact, Jendusa had requested the data under Directive #36, but to no avail. The DOC's Research Review Committee approved his request, but later communications between Jendusa and the DOC's lead research analyst indicated that the DOC was confused about which database Jendusa had requested. Their correspondence also revealed that the lead research analyst was working with Dr. Tyre to identify the database. Eventually, the DOC told Jendusa that he had to sign a memorandum of understanding before it could transfer any data to him and that it was in the process of drafting that memorandum. The DOC never forwarded that memorandum, and it has yet to transfer the database to him.

¶12 Jendusa similarly encountered obstacles in court. After learning that Dr. Tyre had received a preliminary analysis of a Wisconsin-specific base rate, Jendusa requested by subpoena duces tecum that Dr. Tyre produce the database and the preliminary analysis.[9] The State made no attempt to quash the subpoena; yet, on the advice of the DOC's counsel, Dr. Tyre appeared at the motion hearing without the database or the preliminary analysis.

¶13 The circuit court then ordered Dr. Tyre to "personally open and read the spreadsheet containing de-identified

---

[9] A subpoena duces tecum is a request that the witness produce not only himself or herself for live testimony but also certain physical evidence.

recidivism data," "familiarize himself with the contents of that file and be prepared to testify about said contents," and "bring a copy of the aforementioned de-identified file so as to refer to the file if need be." Dr. Tyre, again on the advice of the DOC's counsel but without objecting to the circuit court's order, did not bring the de-identified database to court. He did, however, review the database and his colleague's preliminary analysis. He testified that roughly 7 percent of the 913 Wisconsin sex offenders in the database were convicted of a new sex offense. That number, according to Dr. Tyre, required additional follow-up and refinement to verify. Still, Dr. Tyre confirmed that this preliminary base rate was roughly one-third of the base rate he relied on to predict Jendusa's recidivism risk.

¶14 After hearing Dr. Tyre's testimony, the circuit court ordered the DOC to transmit the full, unredacted database to Jendusa so that Dr. David Thornton, the court-appointed psychologist and co-creator of the Static-99, could analyze it. Dr. Thornton's role was limited to analyzing the data to "determine recidivism information." The circuit court stayed its order pending resolution of the State's petition for leave to appeal that non-final order. The court of appeals denied the State's petition, stating only that the petition "fails to satisfy the criteria for permissive appeal." State v. Jendusa, No. 2018AP2357-LV, unpublished order (Wis. Ct. App. July 16, 2019).

¶15 We granted review of the court of appeals' denial of the State's petition for interlocutory appeal and further directed the parties to address the underlying substantive issues related to the circuit court's discovery order.[10]

## II.  STANDARD OF REVIEW

¶16 We review for an erroneous exercise of discretion the court of appeals' denial of the State's petition for interlocutory appeal.  See Wis. Stat. § 808.03(2); Leavitt v. Beverly Enters., Inc., 2010 WI 71, ¶42, 326 Wis. 2d 421, 784 N.W.2d 683.  The court of appeals erroneously exercises its discretion when it applies the wrong legal standard or makes a decision not reasonably supported by the facts of record.  See State v. Avery, 2013 WI 13, ¶23, 345 Wis. 2d 407, 826 N.W.2d 60.

¶17 We review de novo the circuit court's interpretation and application of Wis. Stat. § 980.036 as the basis for ordering the disclosure of the DOC database.  See Moreschi v. Vill. of Williams Bay, 2020 WI 95, ¶13, 395 Wis. 2d 55, 953 N.W.2d 318.

## III.  ANALYSIS

¶18 We begin by reaffirming our longstanding and sound practice of typically not reviewing the court of appeals'

---

[10] We asked the parties to address whether the DOC database was discoverable on grounds outside of Wis. Stat. ch. 980, including Brady v. Maryland, 373 U.S. 83 (1963).  We also directed the parties to brief the applicability of Wisconsin and federal health-privacy laws.  Because we uphold the discovery order under Wis. Stat. § 980.036(5), we do not address these additional questions.

discretionary denial of a petition for interlocutory appeal. Additionally, we clarify that the court of appeals need not explain why it denied leave to file an interlocutory appeal. Although we conclude that the court of appeals did not err in denying the State's petition for interlocutory appeal, we address the merits of that appeal and determine that the DOC database is "raw data" that is discoverable under Wis. Stat. § 980.036(5).

### A.   Review of Interlocutory Appeal Denials

¶19 Wisconsin Stat. § 808.03(2) governs appeals from non-final orders:

> (2) Appeals by permission.  A judgment or order not appealable as a matter of right under sub. (1) may be appealed to the court of appeals in advance of a final judgment or order upon leave granted by the court if it determines that an appeal will:
>
> > (a) Materially advance the termination of the litigation or clarify further proceedings in the litigation;
> >
> > (b) Protect the petitioner from substantial or irreparable injury; or
> >
> > (c) Clarify an issue of general importance in the administration of justice.

The plain language of § 808.03(2) entrusts to the court of appeals discretion over interlocutory appeals.  As a matter of

well-settled practice,[11] we respect this legislative choice by generally not reviewing a court of appeals' decision to decline a petition for interlocutory appeal. See Leavitt, 326 Wis. 2d 421, ¶47.

¶20 There are several sound reasons for this practice. To do otherwise would "divest" the court of appeals of a power explicitly "entrusted to it" by the legislature. Id. (quoting Aparacor, Inc. v. DILHR, 97 Wis. 2d 399, 404, 293 N.W.2d 545 (1980)). Moreover, by affording litigants two opportunities to seek leave to appeal non-final orders, we would encourage more interlocutory appellate practice. Such a practice would undermine the two purposes of Wis. Stat. § 808.03: "(1) to

---

[11] This court has jurisdiction to review a denial of leave to file an interlocutory appeal under both the Wisconsin Constitution and Wis. Stat. § 808.10(1). See Leavitt v. Beverly Enters., Inc., 2010 WI 71, ¶46, 326 Wis. 2d 421, 784 N.W.2d 683 ("[T]he Wisconsin Constitution provides that we have 'appellate jurisdiction over all courts' and we 'may review judgments and orders of the court of appeals.'" (quoting Wis. Const. art. VII, § 3(2)-(3))); see also § 808.10(1) ("A decision of the court of appeals is reviewable by the supreme court only upon a petition for review granted by the supreme court."). We acknowledge that language from our cases decided shortly after the creation of the court of appeals might be read to mean this court lacks jurisdiction to review such denials. See Aparacor, Inc. v. DILHR, 97 Wis. 2d 399, 403-04, 293 N.W.2d 545 (1980) ("Where the court of appeals denies permission to appeal from an order conceded by the parties to be nonfinal, no review by this court is permitted."); State v. Whitty, 86 Wis. 2d 380, 388, 272 N.W.2d 842 (1978); State v. Jenich, 94 Wis. 2d 74, 77 n.2, 97D, 288 N.W.2d 114 (1980), modified per curiam on reconsideration, 94 Wis. 2d 74, 292 N.W.2d 348 (1980). As we clarified in Leavitt, however, this "strong" language is not a jurisdictional holding but rather an endorsement of our practice of not reviewing denials of petitions for interlocutory appeal. Leavitt, 326 Wis. 2d 421, ¶¶45-47.

protect the trial proceedings by avoiding unnecessary interruptions and delay caused by multiple appeals[;] and (2) to reduce the burden on the court of appeals by limiting the number of appeals to one appeal per case and allowing piecemeal appeals only under the special circumstances set forth in [§] 808.03(2)." Heaton v. Larsen, 97 Wis. 2d 379, 395-96, 294 N.W.2d 15 (1980). Given these considerable disadvantages, we reaffirm that this court will generally not review the court of appeals' denial of a petition for interlocutory appeal.[12]

---

[12] The court has routinely declined to encroach upon the court of appeals' discretion regarding certain classes of interlocutory appeals despite compelling reasons to do so. See Lassa v. Rongstad, 2006 WI 105, ¶¶84-89, 294 Wis. 2d 187, 718 N.W.2d 673 (declining to require the court of appeals to categorically grant petitions for interlocutory appeal regarding discovery orders in defamation cases even where constitutional privileges are implicated); State ex rel. Hass v. Wis. Ct. of Appeals, 2001 WI 128, 248 Wis. 2d 634, 636 N.W.2d 707 (same regarding denied motions for issue or claim preclusion based on a final federal judgment despite federal-state court comity concerns); Jenich, 94 Wis. 2d 74, 97A n.1 (as modified per curiam on reconsideration) (same regarding denied motions to dismiss based on double jeopardy, despite the substantial and irreparable harm of subjecting a defendant to an unlawful second trial).

This court has directed the court of appeals to grant petitions for interlocutory appeal as a matter of course pursuant to our constitutional superintending power in only one circumstance: qualified immunity. See Arneson v. Jezwinski, 206 Wis. 2d 217, 556 N.W.2d 721 (1996). We reached that conclusion on exceptionally strong grounds: denial of those petitions for interlocutory appeal would result in no adequate remedy for the person seeking immunity and in the potentially needless cost and hardship of litigating a case where the defendant is ultimately immune from liability. Id. at 226-30.

14

¶21  That conclusion also leads us to reject the parties' request to extend State v. Scott, 2018 WI 74, 382 Wis. 2d 476, 914 N.W.2d 141.  In Scott, we held that, in order to "facilitate judicial review," the court of appeals must explain the reasons for its discretionary decisions.  Id., ¶¶38-41.  But Scott's rationale is inapposite here; when the court of appeals denies a petition for interlocutory appeal, there generally is no judicial review to facilitate.  See Leavitt, 326 Wis. 2d 421, ¶47.  And in the rare instance that we do review such denials, we do so for larger policy considerations that transcend the particulars of any one case and that are unrelated to any reasons articulated by the court of appeals.  See Arneson v. Jezwinski, 206 Wis. 2d 217, 556 N.W.2d 721 (1996).  Therefore, it is not necessary for the court of appeals to explain why it denied a party leave to file an interlocutory appeal.

¶22  In this case, the court of appeals concluded "that the petition fails to satisfy the criteria for permissive appeal," citing Wis. Stat. § 808.03(2).  As § 808.03(2) is the correct legal standard governing such decisions and the court of appeals reasonably determined the petition did not satisfy those criteria, we conclude that the court of appeals did not erroneously exercise its discretion.  See Avery, 345 Wis. 2d 407, ¶23.

B.  The Discoverability of the DOC Database

¶23  We proceed with a de novo review of the circuit court's order and interpret Wis. Stat. § 980.036 as it applies to the DOC database.  The general discovery provisions set forth

15

in Wis. Stat. ch. 804 do not apply to a Wis. Stat. ch. 980 proceeding. Wis. Stat. § 980.036(11). In such a proceeding, § 980.036 provides the "only methods of obtaining discovery." Id. Jendusa contends that the DOC database is discoverable under the following three subsections of § 980.036:

(2) What a Prosecuting Attorney Must Disclose to a Person Subject to this Chapter. Upon demand, a prosecuting attorney shall disclose to a person subject to this chapter or his or her attorney, and permit the person subject to this chapter or his or her attorney to inspect and copy or photograph, all of the following materials and information, if the material or information is within the possession, custody, or control of the state:

. . .

(h) The results of any physical or mental examination or any scientific or psychological test, instrument, experiment, or comparison that the prosecuting attorney intends to offer in evidence at the trial or proceeding, and any raw data that were collected, used, or considered in any manner as part of the examination, test, instrument, experiment, or comparison.

. . .

(j) Any exculpatory evidence.

. . .

(5) Testing or Analysis of Evidence. On motion of a party, the court may order the production of any item of evidence or raw data that is intended to be introduced at the trial for testing or analysis under such terms and conditions as the court prescribes.

¶24 We focus on the plain language of § 980.036. "If the meaning of the statute is plain, we ordinarily stop the inquiry." State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004

16

WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoted source omitted).  If not specially defined or technical, statutory language "is given its common, ordinary, and accepted meaning." Id.  We read statutory provisions in context rather than in isolation and in a way that "avoid[s] absurd or unreasonable results."  Id., ¶46.

¶25 We begin with subsec. (5) because it is the broadest provision.  The first clause of subsec. (5), "[o]n motion of a party," unambiguously applies to motions by either party.  Here, that clause was satisfied when Jendusa moved the circuit court for the DOC database's disclosure.

¶26 The second clause, "the court may order the production," indicates that if the requested item meets the other criteria in subsec. (5), then the circuit court has discretion to order its production.  That is because we traditionally interpret "may" as permissive, Waukesha Cnty. v. S.L.L., 2019 WI 66, ¶36, 387 Wis. 2d 333, 929 N.W.2d 140, and to "impl[y] a discretionary element," Swatek v. Cnty. of Dane, 192 Wis. 2d 47, 59, 531 N.W.2d 45 (1995).  To that end, subsec. (5) further empowers the circuit court to order the production of applicable evidence "under such terms and conditions as the court prescribes."  Read together, these clauses afford the circuit court wide discretion regarding not only whether a requested item should be produced but also the manner and conditions of its production.

¶27 Next, subsec. (5) covers only "item[s] of evidence" or "raw data."  Jendusa contends that the DOC database, at least in

17

the format that he requests it, is raw data. "Data," according to its dictionary definition,[13] can mean "[f]actual information, especially information organized for analysis or used to reason or make decisions" or "information represented in a form suitable for processing by computer." Data, The American Heritage Dictionary of the English Language 475 (3d ed. 1992). The modifier "raw" signifies that the data has "[n]ot . . . been subjected to adjustment, treatment, or analysis." Raw, American Heritage Dictionary, supra, at 1502. This dictionary definition of "raw data" comports with the term's common use in the social science research context as "information that is gathered for a research study before that information has been transformed or analyzed in any way."[14] Raw Data, Encyclopedia of Survey Research Methods (Paul J. Lavrakas ed., 2008); see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991) (defining "raw data" as "wholly factual information not accompanied by any original written expression").

¶28 The DOC database fits the definition of "raw data." As it is described in the record, the database contains unprocessed information, such as individuals' names and

---

[13] "[W]e may ascertain the term's plain and ordinary meaning through sources such as dictionaries." E.g., State v. Hager, 2018 WI 40, ¶29, 381 Wis. 2d 74, 911 N.W.2d 17.

[14] "A court 'should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.'" State v. Steffes, 2013 WI 53, ¶25, 347 Wis. 2d 683, 832 N.W.2d 101 (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012)).

birthdates, criminal histories, mental health diagnoses, and scores on various actuarial assessments. That information is organized by column, and an individual's unique numerical score in each category is inputed in the intersecting row associated with that individual. In this form, which is how Jendusa has requested it, the data will not have been processed or analyzed. Thus, this matrix of unprocessed, factual information constitutes "raw data."

¶29 But while satisfying the definition of raw data is necessary, it is not sufficient. The purview of subsec. (5) extends only to raw data that is "intended to be introduced at the trial." Unlike the neighboring subsecs. (2) and (3), both of which speak to evidence that a specific party intends to introduce, subsec. (5) contains no similar limitation. Thus, subsec. (5) must apply to raw data that either party intends to introduce at trial. See State v. A.L., 2019 WI 20, ¶17, 385 Wis. 2d 612, 923 N.W.2d 827 ("When the legislature uses different terms in a statute, the terms are presumed to have distinct meanings.").

¶30 That leaves a final interpretive question: what does it mean to intend to introduce raw data at trial? The State suggests that because Jendusa did not intend to introduce only the DOC's raw data, subsec. (5) does not apply. That reading is overly formalistic and disregards the context of ch. 980. We must instead interpret the plain language of subsec. (5) "in the context in which it is used." See Kalal, 271 Wis. 2d 633, ¶46. In the ch. 980 context, raw data is data that informs an

19

expert's analysis regarding the risk a respondent will engage in future acts of sexual violence.  But without that analysis, the raw data alone has no probative value.  Indeed, the language of subsec. (5) reflects this reality in that it acknowledges the purpose of requesting raw data is to subject it to "testing or analysis."  Thus, in the ch. 980 context, the only reasonable reading of "raw data that is intended to be introduced at the trial" is that the analysis of the raw data is intended to be introduced.

¶31  Therefore, Jendusa's intent to introduce an analysis of the DOC's raw data at trial satisfies the requirement in subsec. (5) that he intend to introduce the raw data.[15]  Because

_____

[15] The State levels a cursory argument that, under Burnett v. Alt, 224 Wis. 2d 72, 589 N.W.2d 21 (1999), the circuit court can never order a court-appointed expert to perform an analysis of data.  This argument misunderstands the Alt privilege and ignores the facts of this case.  The Alt court announced that experts have an implied legal privilege to refuse to provide expert testimony.  Id. at 86.  So, "absent a showing of compelling circumstances, an expert cannot be compelled to give expert testimony whether the inquiry asks for the expert's existing opinions or would require further work."  Id. at 89.  Alt based this privilege on the text of Wis. Stat. § 907.06, which predicated a court's appointment of an expert witness on the expert witness' "consent[]."  Id. at 86 ("If a court cannot compel an expert witness to testify, it logically follows that a litigant should not be able to so compel an expert.").

Alt is of no avail to the State for two reasons.  First, the State concedes in its brief that "Dr. Thornton has no objection" to this court appointment or to analyzing this data, and so § 907.06 permits both.  Second, only the privilege holder——here, Dr. Thornton——can invoke the privilege, and he has not done so.  Cf. 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 504.3, at 410 (4th ed. 2017) ("A party to a lawsuit cannot invoke the [patient-provider] privilege unless he or she is the holder . . . .").

the DOC database is discoverable under subsec. (5), there is no need to address whether it is also discoverable under Wis. Stat. § 980.036(2)(h) or (j). See Maryland Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15.

¶32 Of course, in addition to the conditions of subsec. (5), a defendant's request for raw data must also satisfy the other rules of evidence. In particular, the raw data requested must be relevant to the case. See Wis. Stat. § 904.02. That is, a defendant must show that the raw data has some tendency to make more probable his claim that he is not likely to commit future acts of sexual violence. See Wis. Stat. § 904.01. After all, subsec. (5) does not authorize a fishing expedition for any raw data based on speculation that an analysis of that data might be relevant.

¶33 Here, Jendusa's request for raw data satisfies this relevance requirement. Dr. Tyre testified that, although he did not conduct a full analysis of the DOC's data, his colleague's preliminary analysis indicated that it may be exculpatory. Jendusa is not required to wait for the State to conduct a full analysis in order to prove its relevancy. Such an analysis is likely not forthcoming given that the preliminary analysis suggests that the DOC may be overestimating the recidivism risk for offenders such as Jendusa. Dr. Tyre's testimony is sufficient to establish that the DOC database is relevant to Jendusa's defense. Therefore, we conclude that the circuit court permissibly granted Jendusa's motion requiring the DOC to produce the database for Jendusa to analyze.

21

¶34 Finally, we reject the State's argument that the circuit court cannot order the State to turn over the DOC database because the database is not in the State's possession.[16] The thrust of the State's argument is that the DOC "has no connection" to Jendusa's Wis. Stat. ch. 980 proceeding, likening the DOC to the state hospital in State v. Darcy N.K., 218 Wis. 2d 640, 581 N.W.2d 567 (Ct. App. 1998). In Darcy N.K., the court of appeals concluded that a child sexual assault victim's psychiatric records were not in the State's possession because the state hospital that held the records played no role in the defendant's prosecution. Id. at 649-57. The hospital's sole connection to the prosecution was treating the victim. That stands in stark contrast to the critical role the DOC has and continues to play in Jendusa's ch. 980 proceeding. It was a DOC employee, Dr. Tyre, who evaluated Jendusa and, based on DOC records, declared him eligible for commitment as a sexually violent person. The circuit court relied upon that same DOC employee's Special Purpose Evaluation and testimony to find probable cause that Jendusa is a sexually violent person. And it is the DOC who detained Jendusa following the probable cause determination. Thus, far from having "no connection" to

---

[16] Unlike neighboring Wis. Stat. § 980.036(2) and (3), § 980.036(5) does not explicitly require that the requested evidence be "within the possession, custody, or control of the state." The significance of that phrase's absence in subsec. (5), however, is left for another day because we conclude for other reasons that the DOC is "the state" for purposes of Jendusa's Wis. Stat. ch. 980 proceeding.

Jendusa's Wis. Stat. ch. 980 proceeding, the DOC is so inextricably intertwined with this case that it qualifies as "the state" for purposes of Wis. Stat. § 980.036.

¶35 Based on the foregoing analysis, we conclude that Wis. Stat. § 980.036(5) provides the circuit court the discretion to order the disclosure of raw data, like the DOC database, when the respondent moves for such disclosure and intends to introduce an analysis of that raw data at trial.

## IV. CONCLUSION

¶36 We reaffirm our longstanding and sound practice of typically not reviewing the court of appeals' discretionary denial of a petition for interlocutory appeal. We hold that when the court of appeals denies a petition for an interlocutory appeal, it need not explain why. We conclude that, here, the court of appeals did not erroneously exercise its discretion in denying the State's petition for interlocutory appeal. Lastly, we conclude that, pursuant to Wis. Stat. § 980.036(5), the circuit court permissibly ordered the disclosure of the DOC database for the purpose of testing or analysis because Jendusa moved for such disclosure, he intends to introduce an analysis of that raw data at his ch. 980 trial, and it is relevant to that trial. Accordingly, we affirm the court of appeals' order and the circuit court's discovery order and remand the cause to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—The order of the court of appeals is affirmed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶37 ANNETTE KINGSLAND ZIEGLER, J. *(dissenting).* I write separately because the majority undermines our review of future cases and misreads the plain language of the statute. The majority errs when it concludes that the court of appeals does not need to explain why it denies a party's motion for leave to file an interlocutory appeal because of our general deference to the court of appeals in this area. The majority also errs when it concludes that the Department of Corrections' (DOC) database is discoverable in this case under Wis. Stat. § 980.036(5) because raw data has meaning only in the context of analysis. These errors will impact not only this case, but will detrimentally affect our review of the court of appeals in future cases.

¶38 To reach its conclusions, the majority ignores our prior cases and the choice of the legislature. It carves out an exception from a general rule that allows us to review the decisions of the court of appeals. Moreover, it reads language into the statute that the legislature did not include.

¶39 I conclude that the court of appeals must explain its reasoning when it denies a party's motion for leave to file an interlocutory appeal. I also conclude that the DOC's database is not discoverable under Wis. Stat. § 980.036(5)'s plain language. Accordingly, I respectfully dissent.

## I. THE COURT OF APPEALS MUST EXPLAIN ITS REASONING WHEN IT EXERCISES ITS DISCRETION.

¶40 When a party moves for leave to file an interlocutory appeal, the court of appeals is statutorily bound to assess certain factors in making its determination. See Wis. Stat.

1

§ 808.03(2). The court of appeals may hear an appeal of a non-final order "if it determines that an appeal will":

> (a) Materially advance the termination of the litigation or clarify further proceedings in the litigation;
>
> (b) Protect the petitioner from substantial or irreparable injury; or
>
> (c) Clarify an issue of general importance in the administration of justice.

Id. "It is well settled that petitions seeking review of a court of appeals' denial of leave to appeal are generally not permitted." Leavitt v. Beverly Enterprises, Inc., 2010 WI 71, ¶47, 326 Wis. 2d 421, 784 N.W.2d 683 (quoted source omitted). However, this general practice does not mean we do not have jurisdiction to review these denials. Id., ¶5 ("Article VII, § 3 of the Wisconsin Constitution provides that this court has jurisdiction to review an order issued by the court of appeals.").

¶41 When we exercise our constitutional power to review discretionary decisions of the court of appeals, we must have some explanation of the court of appeals' reasoning. State v. Scott, 2018 WI 74, ¶¶35-41, 382 Wis. 2d 476, 914 N.W.2d 141 (requiring the court of appeals to explain its reasoning when it exercises its discretion). As we explained in Scott, "[o]ur jurisprudence governing the proper exercise of circuit court discretion is instructive in determining whether the court of appeals must explain the reasons underlying its discretionary decision-making." Id., ¶38. Accordingly, we may look to the requirements we have placed upon the circuit courts and

2

determine whether those requirements apply to the court of appeals in the context of the denial of a motion for leave to file an interlocutory appeal. I conclude that those requirements do apply.

¶42 "When a circuit court exercises its discretion, it must explain on the record its reasons for its discretionary decision 'to ensure the soundness of its own decision making and to facilitate judicial review.'" Id. (quoting Klinger v. Oneida Cnty., 149 Wis. 2d 838, 847, 440 N.W.2d 348 (1989)). We require this of circuit courts because "a circuit court's discretionary decision 'is not the equivalent of unfettered decision-making.'" Id. (quoting Hartung v. Hartung, 102 Wis. 2d 58, 66, 306 N.W.2d 16 (1981)). This requirement ensures that a circuit court examined the relevant facts, applied the proper standard of law, and used a rational process to arrive at a conclusion that a reasonable judge would make. Id., ¶39. Absent an explanation on the record, we cannot determine whether the circuit court complied with this standard. Accordingly, as we have held, "[i]f a circuit court fails to explain its exercise of discretion on the record, it has erroneously exercised its discretion." Id.

¶43 We have previously applied this rationale to the court of appeals. See id., ¶¶40-41. Although we found no case "that require[d] the court of appeals to explain the reasons underlying its discretionary decisions," "the justification that this court has relied upon to require a circuit court to explain its discretionary decision-making applies equally to the court

3

of appeals." <u>Id.</u>, ¶40. "The court of appeals should explain its discretionary decision-making to ensure the soundness of that decision-making and to facilitate judicial review." <u>Id.</u>

¶44 This case presents us with an opportunity to reaffirm the principle that we set forth in <u>Scott</u>. Instead of continuing to require the court of appeals to explain its discretionary decision-making, the majority balks and carves out an exception not found in <u>Scott</u>'s proclamation. <u>See</u> majority op., ¶¶20-21. The majority reasons that because we "generally [do] not review the court of appeals' denial of a petition for interlocutory appeal," the court of appeals need not explain its reasoning for a denial. Majority op., ¶20. However, the majority conflates general deference with actual review. When we afford the court of appeals or the circuit court deference, we are merely stating that we will not second-guess their decision unless that decision cannot be supported by the facts, law, or rationality. <u>See</u> <u>Scott</u>, 382 Wis. 2d 476, ¶¶39-40 (applying the standard of review to the court of appeals); <u>Rechsteiner v. Hazelden</u>, 2008 WI 97, ¶28, 313 Wis. 2d 542, 753 N.W.2d 496 (applying the standard of review to the circuit court). However, for us to understand whether a court of appeals' or circuit court's decision can be supported by the facts, law, or rationality, we must have that court's explanation of its reasoning. Without

4

the reasoning, we have nothing to actually review, and our constitutional power to review is gutted.[1]

¶45 This case exemplifies why this is so. Here, the court of appeals denied, without explanation, the State's motion for leave to appeal. The court of appeals merely stated that the State's "petition fails to satisfy the criteria for permissive appeal." However, when looking at the factors the court of appeals must consider, at least one of them seems to be implicated. The State here has alleged that it will face "substantial or irreparable injury" if it is ordered to release the DOC database. Presumably, the court of appeals disagreed. Why? We will never know because the court of appeals never explained its reasoning. We cannot know whether the court of appeals examined the relevant facts, applied the proper standard of law, or used a rational process to reach its conclusion. How then are we to determine whether the court of appeals erroneously exercised its discretion? We cannot.

¶46 Accordingly, the majority has now given the court of appeals "unfettered decision-making" power over interlocutory appeals. See majority op., ¶¶20-21. Without anything to review, our "general deference" to the court of appeals transforms into total deference to the court of appeals. Rather

---

[1] For example, if a circuit court was to deny Jendusa's request to admit certain evidence, but failed to explain its reasons for denying the evidence, we would be left having to guess why the circuit court denied Jendusa's request. Rather than reviewing the circuit court's decision, we would be making a decision as if we were the circuit court. This would undermine any deference we afford the circuit court.

5

than give the court of appeals total deference, I would require the court of appeals to explain its reasoning when it denies a party's motion for leave to file an interlocutory appeal so that we have some basis to exercise our constitutional power to review the court of appeals. Because the court of appeals did not explain its decision, it erroneously exercised its discretion.[2]

## II. THE DOC DATABASE CANNOT BE DISCOVERED UNDER WIS. STAT. § 980.036(5).

¶47 Moving to the underlying merits of the claim, the majority incorrectly concludes that the State must disclose the DOC database pursuant to the circuit court's order under Wis. Stat. § 980.036(5). However, the majority impermissibly reads language into the statute to reach this conclusion. Based on the plain language, Jendusa cannot obtain the DOC database because it was not intended to be introduced at trial.

¶48 Statutory interpretation "begins with the language of the statute." State ex rel. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. "If

---

[2] The majority does not explain how addressing the underlying merits of this appeal does not "encroach upon the court of appeals' discretion regarding certain classes of interlocutory appeals . . . ." Majority op., ¶20 n.12. Indeed, it seems contradictory to say that we will not encroach upon the court of appeals' decision not to address the merits of an appeal, then address the merits of the appeal. Moreover, addressing the merits of this appeal when affirming the court of appeals' dismissal is contrary to our longstanding doctrine that "[w]hen the resolution of one issue disposes of an appeal, we will not address additional issues." Barber v. Weber, 2006 WI App 88, ¶19, 292 Wis. 2d 426, 715 N.W.2d 683 (citing Gross v. Hoffman, 227 Wis. 296, 300, 277 N.W. 663 (1938)).

the meaning of the statute is plain, [then] we ordinarily stop the inquiry." Id. We give statutory language "its common, ordinary, and accepted meaning." Id. We give "technical or specially-defined words or phrases" their "technical or special definitional meaning." Id. "Context is important to meaning" and must be interpreted "as part of a whole." Id., ¶46.

¶49 The legislature has limited the scope of discovery in chapter 980 proceedings. Wis. Stat. § 980.036(11) ("This section provides the only methods of obtaining discovery and inspection in proceedings under this chapter."). Accordingly, to receive the DOC database, Jendusa must show that it is discoverable under one of the provisions of § 980.036. The majority focuses its analysis on § 980.036(5).[3] Section

---

[3] Because the majority concludes that the DOC's database is discoverable under Wis. Stat. § 980.036(5), the majority does not address the other bases upon which Jendusa argues he may obtain the data, namely Wis. Stat. § 980.036(2)(h) and (2)(j). However, Jendusa would still not be able to discover the DOC's database under either of these provisions.

Wisconsin Stat. § 980.036(2)(h) provides that the prosecuting attorney must disclose:

[t]he results of any physical or mental examination or any scientific or psychological test, instrument, experiment, or comparison that the prosecuting attorney intends to offer in evidence at the trial or proceeding, and any raw data that were collected, used, or considered in any manner as part of the examination, test, instrument, experiment, or comparison.

7

980.036(5) provides that "[o]n motion of a party, the court may order the production of any item of evidence or raw data <u>that is intended to be introduced at the trial</u> for testing or analysis under such terms and conditions as the court prescribes." (Emphasis added.) This language is as clear as it could be——some party must intend to introduce at trial the raw data requested. Neither the State nor Jendusa claimed they would introduce the raw data at trial. As such, under the plain language of the statute, Jendusa cannot obtain the DOC database under Wis. Stat. § 980.036(5).

¶50 The majority asserts that it is "overly formalistic" to comply with the plain language of the statute. Majority op., ¶30. The majority concludes that "the only reasonable reading of 'raw data that is intended to be introduced at the trial' is

_____

(Emphasis added.) Here, the database was not "collected, used, or considered in any manner as part of the examination, test, instrument, experiment, or comparison." The State does not intend to offer the database, or anything generated from the database, at the trial or proceeding. Accordingly, the prosecuting attorney is not required to disclose the DOC's database to Jendusa under subsec. (2)(h).

Wisconsin Stat. § 980.036(2)(j) provides that the prosecuting attorney must disclose "[a]ny exculpatory evidence." Despite Jendusa's claim that the DOC's database may prove that he does not meet the criteria for commitment, unanalyzed raw data cannot serve as exculpatory evidence because it is unclear whether testing "would produce inculpatory, exculpatory, or inconclusive results," and the defendant cannot put an "exculpatory spin" on the unanalyzed data to make it discoverable. State v. Franszczak, 2002 WI App 141, ¶¶21, 23, 256 Wis. 2d 68, 647 N.W.2d 396. Here, the DOC's database is unanalyzed raw data and thus not exculpatory evidence. Accordingly, the prosecuting attorney is not required to disclose the DOC's database to Jendusa under subsec. (2)(j).

8

that the analysis of the raw data is intended to be introduced." Id. The majority is wrong for two reasons. First, it ignores our basic mandate that when the meaning of the statute is plain, we stop the inquiry. See Kalal, 271 Wis. 2d 633, ¶45. As explained above, the language could not be any clearer that the raw data must be intended to be introduced at trial. Second, the majority commits the basic error of reading language into the statute. State v. Matasek, 2014 WI 27, ¶20, 353 Wis. 2d 601, 846 N.W.2d 811 ("We should not read into the statute language that the legislature did not put in."). The majority asserts intending to introduce the analysis of raw data is the same as intending to introduce the raw data itself. Majority op., ¶30. However, this is not what the statute states. The statute states that only the "raw data that is intended to be introduced at the trial" is discoverable. Wis. Stat. § 980.036(5). The majority's contention is even more confusing considering an expert's analysis would be "evidence." As such, an expert's analysis of raw data is already discoverable under § 980.036(5). Despite the majority's wishing the language to be in the statute, it is not. The legislature permitted a party to discover only the raw data that is intended to be introduced——not its analysis or results of tests from the raw data.

¶51 The majority's error is even more clear when comparing Wis. Stat. § 980.036(5) to nearby statutes. See Kalal, 271 Wis. 2d 633, ¶46 ("[S]tatutory language is interpreted . . . in relation to the language of surrounding or closely-related

statutes . . . ."). Pursuant to section 980.036(2), the State must disclose certain information to an individual subject to a chapter 980 proceeding. Included in this information are both the results of any tests and the raw data used in those tests. Wis. Stat. § 980.036(2)(h) ("The results of any physical or mental examination or any scientific or psychological test, instrument, experiment, or comparison that the prosecuting attorney intends to offer in evidence at the trial or proceeding, and any raw data that were collected, used, or considered in any manner as part of the examination, test, instrument, experiment, or comparison."). If the legislature intended an individual to receive raw data that could be used as part of a test, it could have mirrored the language of subsection (2)(h) in subsection (5). Instead, the legislature did not use such language, indicating that it provided for the discovery of only raw data that is intended to be introduced at trial, not raw data that could then be part of an expert's analysis, which may or may not be introduced.

¶52 Following a natural progression, the majority's conclusion transforms chapter 980 discovery from extremely limited, as the legislature devised, see Wis. Stat. § 980.036(11), to a fishing expedition——allowing an individual to seek any data from the State that may assist the individual's case. Certainly when the legislature limited discovery in chapter 980 cases, it did not incidentally leave open this door.

¶53 I would apply the plain language that the legislature chose——"intended to be introduced"——and conclude that Jendusa

10

may not receive the DOC database under Wis. Stat. § 980.036(5) because no party intended to introduce this raw data at trial.

### III. CONCLUSION

¶54 To reach its conclusions, the majority ignores our prior cases and the choice of the legislature. It carves out an exception from a general rule that allows us to review the decisions of the court of appeals. Moreover, it reads language into the statute that the legislature did not include.

¶55 I conclude that the court of appeals must explain its reasoning when it denies a party's motion for leave to file an interlocutory appeal. I also conclude that the DOC's database is not discoverable under Wis. Stat. § 980.036(5)'s plain language. Accordingly, I respectfully dissent.

¶56 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK and Justice REBECCA GRASSL BRADLEY join this dissent.